| | | |
|---|---|---|
| NICK LOEB, HUMAN EMBRYO #3 HB-A, EMBRYO #4 HB-A | * | NO. 2020-CA-0261 |
| | * | |
| | | COURT OF APPEAL |
| VERSUS | * | |
| | | FOURTH CIRCUIT |
| SOFIA VERGARA | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
25TH JDC, PARISH OF PLAQUEMINES
NO. 64-217, DIVISION "A"
Honorable Kevin D. Conner, Judge
* * * * * *
**Judge Regina Bartholomew-Woods**
* * * * * *
(Court composed of Judge Joy Cossich Lobrano, Judge Sandra Cabrina Jenkins, Judge Regina Bartholomew-Woods)

**LOBRANO, J., CONCURS IN THE RESULT**

William A. Roe
ATTORNEY AT LAW
2011 Milan Street
New Orleans, LA 70115

Pierre V. Miller, II
PATRICK, MILLER, BURNSIDE & BELLEAU, L.L.C.
400 Poydras Street, Suite 1680
Texaco Center
New Orleans, LA 70130

Jalesia McQueen
McQueen Kuenzel, LLC
10805 Sunset Office Drive, Suite 300
St. Louis, MO 63127

      COUNSEL FOR PLAINTIFF/APPELLANT

Kyle D. Schonekas
Ellie T. Schilling
SCHONEKAS EVANS McGOEY & McEACHIN, L.L.C.
909 Poydras Street, Suite 1600
New Orleans, LA 70112

George Pivach II
PIVACH, PIVACH, HUFFT, THRIFFILEY & DUNBAR, L.L.C.
8311 Highway 23, Suite 104
P. O. Box 7125
Belle Chasse, LA 70037

Fred Silberberg
FRED SILBERBERG PROFESSIONAL CORP.
1223 Wilshire Blvd., No. 451
Santa Monica, CA  90403, CA 90212

Godfrey Bruce Parkerson
Matthew T. Habig
Jamie F. Jacks
PLAUCHE' MASELLI PARKERSON, LLP
701 Poydras Street, Suite 3800
New Orleans, LA 70139

COUNSEL FOR DEFENDANT/APPELLEE

James Harmon
400 Poydras Street, Suite 1680
New Orleans, LA 70130

**REVERSED IN PART, AMENDED IN PART,
AFFIRMED IN PART, RENDERED IN PART
JANUARY 27, 2021**

*RBW*

*SCJ*

This case presents a *res nova* issue for the State of Louisiana; it involves the resolution of whether the Uniform Child Custody Jurisdiction and Enforcement Act codified in La. R.S. 13:1801("UCCJEA") applies to a petition for custody over two embryos pursuant to the Louisiana Human Embryo Statutes codified in La. R.S. 9:121-133 ("Human Embryo Statutes"). The current action involves a dispute between two donors over two embryos that are now, and have always been, since their creation, physically located in a reproductive facility in the State of California. Plaintiffs-Appellants, who purport to be domiciled and residents of Louisiana, filed a lawsuit in the 25th Judicial District Court in Plaquemines Parish, Louisiana to establish custodial rights over the embryos. Defendant-Appellee, a resident of the State of California, filed a lawsuit against one of the Plaintiffs-Appellants, prior to the instant action being filed against her. In response to the instant action, Defendant-Appellee filed various dilatory, declinatory and

1

peremptory exceptions. The trial court sustained all of the exceptions and dismissed the lawsuit with prejudice. It is from that judgment that Plaintiffs-Appellants have filed the instant appeal. For the reasons that follow, we reverse in part, amend in part, affirm in part and render in part, the judgment of the trial court.

## FACTUAL BACKGROUND

In January 2010, Plaintiff-Appellant, Nick Loeb ("Mr. Loeb") and Defendant-Appellee, Sofia Vergara ("Ms. Vergara") met in West Hollywood, California and began a romantic relationship. Ms. Vergara, an actress and model, was, at all relevant times, and continues to be, a resident of the State of California. Mr. Loeb was a citizen of the State of Florida, who also maintained a residence in New York City. On July 10, 2012, Mr. Loeb and Ms. Vergara became engaged to be married.

In early 2013, Mr. Loeb and Ms. Vergara contracted with Assisted Reproductive Technologies ("ART") in Beverly Hills, California to undergo in vitro fertilization ("IVF")[1] in order to produce biological children to be carried to term by a gestational surrogate. Ms. Vergara and Mr. Loeb selected a friend and

---

[1] "Generally, the procedure for IVF starts with the woman's ovaries being hormonally stimulated so that the woman can produce multiple eggs. The eggs that the woman produces are then removed by either ultrasound-directed needle aspiration or laparoscopy, and the eggs are then put into a glass petri dish where the eggs are introduced to sperm. After the egg is fertilized by a sperm cell, this fusion, also known as a prezygote or preembryo, keeps dividing until the prezygote gets to the four-to-eight cell stage, at which time several of the prezygotes are transferred into the woman's uterus by means of a cervical catheter. If the procedure is successful, an embryo will affix itself to the wall of the woman's uterus, differentiate, and grow into a fetus." Marisa G. Zizzi, *The Preembryo Prenup: A Proposed Pennsylvania Statute Adopting A Contractual Approach to Resolving Disputes Concerning the Disposition of Frozen Embryos*, 21 Widener L.J. 391, 393-95 (2012).

employee of Ms. Vergara to be the surrogate and entered into a "Gestational Surrogate Parenting Agreement" with her. Subsequently, Ms. Vergara and Mr. Loeb underwent several IVF treatments, which resulted in several pre-embryos.[2] Genetic testing was performed on the pre-embryos and it was determined that only two of the pre-embryos were viable. Ms. Vergara and Mr. Loeb attempted two (2) separate unsuccessful implantations of the pre-embryos into the surrogate's uterus.

During the summer of 2013, Ms. Vergara and Mr. Loeb met in Los Angeles, California with a representative from a surrogacy agency to discuss finding another gestational surrogate. Mr. Loeb avers that he, along with Ms. Vergara and the agency signed a "Surrogacy Program Retainer Agreement." After the agency presented two (2) candidates to Ms. Vergara and Mr. Loeb, Ms. Vergara, via email dated June 24, 2013, indicated to Mr. Loeb that she wanted to meet the candidates in person. In turn, Mr. Loeb sent an email to the agency indicating that he and Ms. Vergara would plan to meet the candidates in August 2013, when he and Ms. Vergara would both be in California.

On November 16, 2013, Mr. Loeb and Ms. Vergara executed another contract with ART to initiate another round of IVF. They executed a "General Informed Consent for Procedures Involved in [IVF]" ("the contract") which

---

[2] "'Pre-embryo' is a medically accurate term for a zygote or fertilized egg that has not been implanted in a uterus. It refers to the approximately 14-day period of development from fertilization to the time when the embryo implants in the uterine wall and the 'primitive streak,' the precursor to the nervous system, appears." *Right of Husband, Wife, or Other Party to Custody of Frozen Embryo, Pre-embryo, or Pre-zygote in Event of Divorce, Death, or Other Circumstances*, 87 A.L.R. 5th 253 (2001) (citing *Coleman, Procreative Liberty and Contemporaneous Choice: An Inalienable Rights Approach to Frozen Embryo Disputes*, 84 Minn. L. Rev. 55 (1999)).

included a "Directive for Partners Regarding the Storage and Disposition of CryoPreserved Materials Which May Include Embryos,"[3] ("the Directive") requiring both parties to consent to uterine transfer of the embryos.[4] The Directive provided three (3) options for the embryos in the event of the death of either Ms. Vergara or Mr. Loeb: (1) donate the embryos to research; (2) thaw the embryos with no further action; or (3) if one party died, allow the embryos to be used in a living partner. Mr. Loeb asserts that Ms. Vergara forced him to choose option number two (2).

The latest IVF procedure resulted in several pre-embryos. However, genetic testing of the pre-embryos revealed that only two were viable, to wit: female pre-embryos, Plaintiffs-Appellants, Human Embryo #3 HB-A and Embryo #4 HB-A ("the embryos").[5] Because Mr. Loeb and Ms. Vergara had not yet chosen a surrogate, the embryos were cryopreserved at ART.

---

[3] A review of the record reveals that both the terms "pre-embryo" and "embryo" have been used interchangeably throughout the litigation by Ms. Vergara and Appellants, respectively. "'Pre–embryo' is a medically accurate term for a zygote or fertilized egg that has not been implanted in a uterus." 87 A.L.R.5th 253 (2001). "An embryo proper develops only after implantation. The term 'frozen embryos' is a term of art denoting cryogenically preserved pre–embryos." *Id.* Although there is a scientific difference between pre-embryos and embryos, the contract and the Directive entered into between Mr. Loeb and Ms. Vergara refer only to "embryo" and not "pre-embryo." Furthermore, in accordance with Louisiana Revised Statute 9:121, "a human embryo…is an [IVF] human ovum…comprised of one or more living human cells and human genetic material so unified and organized that it will develop in utero into an unborn child." For purposes of this opinion, the differences bear no significance on our holdings in this opinion in light of the applicable statutory and jurisprudential authorities controlling our analyses and conclusions of law. Thus, there should not be any intent derived from our interchangeable use of the words "pre-embryo" or "embryo" throughout this opinion.

[4] The contract included directives for the care, maintenance, and disposal of the embryos. Mr. Loeb alleges that the documents were signed on the same day that they were presented to both he and Ms. Vergara and that neither he nor Ms. Vergara were able to consult legal counsel or modify the documents.

[5] In his petition that he filed with the 24th Judicial District Court in the Parish of Jefferson, State of Louisiana, on December 7, 2016, which preceded the current litigation, Mr. Loeb alleges that

4

According to Ms. Vergara, in March 2014, she and Mr. Loeb began discussing ending their relationship. She asserts that they spent several weeks in Florida together in April 2014, where they saw a therapist and agreed to end their relationship.

From May 1, 2014, until July 4, 2014, Ms. Vergara rented a house in New Orleans, Louisiana, while she was filming a movie in the city. On May 3, 2014, Ms. Vergara and Mr. Loeb attended the White House's Correspondents' Dinner together as they had previously planned. During that time, Mr. Loeb asked Ms. Vergara if he could stay with her in New Orleans while he performed his first stint as a volunteer deputy at the Plaquemines Parish Sheriff's Office. Ms. Vergara asserts that Mr. Loeb arrived on May 7, 2014, and they resided together until he left on May 12, 2014. They made a public announcement about their breakup on May 23, 2014. Ms. Vergara claims that Mr. Loeb returned to New Orleans in June 2014, in an attempt to reconcile with Ms. Vergara, to no avail.

Contrarily, Mr. Loeb asserts that on May 12, 2014, he and Ms. Vergara argued about their relationship, and their relationship did not end until May 13, 2014, while he was driving to the Louis Armstrong New Orleans International Airport. He asserts that even after the relationship ended, he repeatedly attempted to communicate with Ms. Vergara about the embryos and his desire to have them transferred to a surrogate for further development, but Ms. Vergara was unwilling. He also asserts that he asked Ms. Vergara to confirm that the embryos would not

he and Ms. Vergara have publicly identified themselves as the biological father and biological mother of Emma and Isabella, i.e., Human Embryo #3 HB-A and Embryo #4 HB-A.

5

be destroyed, and to allow the surviving person to have custody if the other should die, or to give him full custody. Allegedly, Ms. Vergara refused all of his requests.

Ms. Vergara disputes Mr. Loeb's assertions and avers that Mr. Loeb did not bring up the status of the pre-embryos when their relationship ended. According to Ms. Vergara, in September 2014, she received a telephone message from a lawyer representing Mr. Loeb asking for her attorney's contact information, but she never responded. Instead, Ms. Vergara, who was in New York at the time, sent a text message to Mr. Loeb asking why a lawyer had contacted her. She met with Mr. Loeb, who, for the first time she claims, brought up the pre-embryos. She asserts that she was surprised that Mr. Loeb wanted to try to bring the pre-embryos to term and told him that she wanted them to remain cryopreserved.

Irrespective of whose version of events is correct surrounding their breakup, presently, the embryos remain in cryopreservation at ART in California, where they were created and have always been located.

## **PROCEDURAL HISTORY**

On August 29, 2014,[6] Mr. Loeb filed suit against Ms. Vergara and ART in Santa Monica Superior Court located in California seeking a declaratory judgment for full custody of the pre-embryos, as well as an order directed to ART to allow him to bring the embryos to term without Ms. Vergara's consent.[7] In that suit, Mr. Loeb asserted that venue was proper in California because the acts and omissions

---

[6] The suit was captioned *Nicholas Loeb* v. *Sofia Vergara, et. al,* Case No. SS 024581.

[7] Mr. Loeb alleged a contract cause of action for rescission of the parties' written agreement and enforcement of an alleged oral agreement in an attempt to gain custody and control of the pre-embryos.

6

giving rise to the suit occurred in California. Also, in that lawsuit, Mr. Loeb asserts that he was a citizen of the State of Florida.

On November 30, 2016, Mr. Loeb created the Louisiana Trust ("the Trust"). On December 5, 2016, Mr. Loeb modified the Trust to benefit Emma and Isabella, the names he gave to the embryos, if they were born alive; the Trust was then renamed the "Emma and Isabella Louisiana Trust No. 1." James Charbonnet, a Louisiana attorney, was named as trustee.

On December 6, 2016, Mr. Loeb filed a request for voluntary dismissal of his California lawsuit, without prejudice. Ms. Vergara asserts that Mr. Loeb dismissed the lawsuit because during the litigation it had come to light that two of Mr. Loeb's former girlfriends had abortions, which called into question Mr. Loeb's intentions for filing the California lawsuit.[8] According to Ms. Vergara, when Mr. Loeb failed to disclose the identities of the former girlfriends and disobeyed a court order to do so, Ms. Vergara filed a motion for discovery sanctions, which was set for hearing one day after a previously filed motion for summary judgment. However, according to Ms. Vergara, less than one week before the hearing date on the motions, Mr. Loeb voluntarily dismissed his lawsuit, without prejudice.

On December 7, 2016, the day after dismissing the California lawsuit, a lawsuit was filed on behalf of "Human Embryo #4 HB-A, by and through Emma and Isabella Louisiana Trust No. 1, Human Embryo #3 HB-A, by and through

---

[8] In deposition testimony and media quotes, Mr. Loeb admits that he dismissed the California lawsuit because he did not want to disclose the identities of the former girlfriends who were pregnant with his children and had undergone abortions.

Emma and Isabella Louisiana Trust No. 1, Emma and Isabella Louisiana Trust No. 1, and James Charbonnet, in his capacity as Trustee of Emma and Isabella Louisiana Trust No. 1" against Ms. Vergara in the 24th Judicial District located in the Parish of Jefferson, State of Louisiana. The lawsuit stated that Mr. Loeb resided in Delray Beach, Florida. The lawsuit sought the following relief: (1) a declaratory judgment declaring the Directive a void and unenforceable contract between Mr. Loeb and Ms. Vergara; (2) a declaratory judgment declaring that the Directive does not control decisions regarding the future and disposition of Emma and Isabella; (3) rescission of the Directive due to duress; rescission of the general informed consent as against public policy; (4) rescission of the Directive due to fraud and misrepresentation; (5) a declaratory judgment prohibiting consent to the destruction and death of Emma and Isabella; mandating Ms. Vergara release Emma and Isabella for uterine transfer, continued development, and live birth; (6) breach of oral contract; tortious interference with inheritance; appointment of Mr. Loeb as curator of Emma and Isabella; (7) a declaration of Ms. Vergara as an egg donor with regard to Emma and Isabella; and (8) termination of Ms. Vergara's parental rights with regard to Emma and Isabella.

On February 21, 2017, Ms. Vergara removed the lawsuit to the United States District Court for the Eastern District of Louisiana ("the federal district court") and alleged diversity and federal question jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1331, respectively. Ms. Vergara then filed a motion to dismiss alleging she was not subject to personal jurisdiction in Louisiana, that venue was improper, and

that plaintiffs[9] failed to join ART as an indispensable party. The plaintiffs filed a motion to remand the matter to state court arguing that the federal district court lacked subject matter jurisdiction. On August 25, 2017, the federal district court granted Ms. Vergara's motion to dismiss; ruling that Ms. Vergara was not subject to personal jurisdiction in Louisiana for the claims stated in the litigation. The federal district court chose to address personal jurisdiction, because it was straightforward, unlike the more novel issues raised, pertaining to subject matter jurisdiction regarding citizenship of the embryos, the monetary value of the rights over the embryos and the constitutionality of Louisiana laws pertaining to IVF created embryos. Plaintiffs did not appeal the decision of the federal district court.

On February 14, 2017, Ms. Vergara filed suit against Mr. Loeb in Superior Court, Los Angeles County, California seeking, among other relief, a declaratory judgment that the contract be enforced and a permanent injunction to prevent Mr. Loeb from bringing the pre-embryos to term without Ms. Vergara's express written consent as set forth in the contract.[10] This matter remains pending.

Mr. Loeb alleges that he moved to Plaquemines Parish, Louisiana in December 2017, and subsequently became a Louisiana resident. On January 9, 2018, while the latest California lawsuit remained pending between Ms. Vergara and Mr. Loeb, Mr. Loeb filed a petition for custody on behalf of himself and the embryos (collectively "Appellants") pursuant to the UCCJEA against Ms. Vergara. In their original petition, Appellants asserted that the embryos are living children

---

[9] The plaintiffs included the Trust, Emma, Isabella, and Mr. Charbonnet.

[10] This suit is captioned *Sofia Vergara v. Nick Loeb, et al,* Case No. BC650580.

over whom Mr. Loeb should be granted full custody because: Ms. Vergara has violated her "high duty of care and prudent administration" owed them by refusing to allow them to be born; their right to be free from slavery; and their right to equal protection under the laws as guaranteed by the Thirteenth (13th) and Fourteenth (14th) Amendments to the United States Constitution, respectively.

Ms. Vergara removed the suit to the federal district court pursuant to 28 U.S.C. §§ 1331 ("federal question") and 1332(a)(1) ("diversity").[11] Ms. Vergara also filed a motion to dismiss pursuant to Rule 12(b)(6) (failure to state a claim) and 12(b)(2) (lack of personal jurisdiction) of the Federal Rules of Civil Procedure, due to plaintiffs' failure to state a claim under the UCCJEA, because the UCCJEA pertains to living children and not IVF created pre-embryos, and because the court lacked personal jurisdiction over Ms. Vergara. Additionally, Ms. Vergara asserted that the 25th Judicial District Court is a court of improper venue and that plaintiffs failed to join an indispensable party—ART. In response to her removal petition, Appellants filed a motion to remand asserting that the federal district court lacked diversity and federal question subject matter jurisdiction; and more importantly, they amended their lawsuit to eliminate the claims arising under the 13th and 14th Amendments to the United States Constitution;[12] thereby leaving pending only Appellants' state-law UCCJEA claim—a sole Family Law issue. The federal

---

[11] See *Loeb v. Vergara,* 2018 WL 2985319 fn. 2 (E.D. La. June 16, 2018).

[12] Even though Appellants eliminated their 13th and 14th Constitutional Amendment claims in their amended complaint, in their briefs filed and arguments made before this Court they assert that relief should be granted under both of these Constitutional Amendments. In conducting analyses and reaching conclusions regarding Appellants' assignments of errors we have not given any consideration to either Constitutional argument forwarded by Appellants in their briefs since they were dismissed by Appellants and should not have been made a part of their brief.

district court ruled that because the only matter left was a purely state law custody claim, it lacked jurisdiction to hear the matter, because federal courts do not have jurisdiction to preside over matters arising out of state Family Law. Therefore, the matter was remanded to the 25th Judicial District Court.

Following the remand, on July 2, 2018, Ms. Vergara filed in the trial court the following exceptions: (1) peremptory exception of no right of action, (2) peremptory exception of no cause of action, (3) peremptory exception of nonjoinder, (4) declinatory exception of improper venue, (5) declinatory exception of lack of personal jurisdiction, (6) declinatory exception of lack of subject matter jurisdiction, (7) declinatory exception of *lis pendens*; and (8) dilatory exception of lack of procedural capacity.

In her exceptions pleading, Ms. Vergara asserted that "the pre-embryos do not have a right of action against Ms. Vergara; [Mr.] Loeb does not have a cause of action against Ms. Vergara under the UCCJEA; venue is not proper; [Mr.] Loeb failed to join ART, an indispensable party to the lawsuit; Louisiana does not have personal jurisdiction over Ms. Vergara; Louisiana does not have subject matter jurisdiction; California is already adjudicating this same dispute and the pre-embryos do not have the procedural capacity to sue Ms. Vergara."

On July 26, 2018, Ms. Vergara filed a motion with the trial court to conduct limited discovery pertaining to the sole issues of jurisdiction and venue. On September 7, 2018, the trial court signed a consent judgment reached between the parties, which allowed Ms. Vergara to conduct discovery limited to issues of venue

11

and jurisdiction. The judgment further provided that Ms. Vergara's limited discovery did not serve as an appearance for or waiver of her objection to personal jurisdiction. It also reserved Appellants' right to attempt to conduct general discovery and Ms. Vergara's right to oppose the same.

On November 15, 2018, Ms. Vergara filed a motion to stay discovery that had been served upon her by Appellants. On March 18, 2019, the trial court held a hearing regarding Ms. Vergara's stay. The trial court issued a judgment on April 9, 2019, which was noticed on April 10, 2019, wherein it granted Ms. Vergara's request for a stay of the discovery. However, it limited the time and scope of the stay as follows: it was effective only through the date and time that the exceptions filed by Ms. Vergara would be disposed of, and Appellants were permitted to propound discovery related solely to the issues of jurisdiction, domicile and venue in order to respond to Ms. Vergara's exceptions.

On June 21, 2019, Appellants filed a motion to compel discovery against Ms. Vergara arguing that she failed to provide complete answers to discovery requests related to issues of jurisdiction and venue pursuant to the UCCJEA. On August 19, 2019, the trial court held a hearing on the motion to compel and took the matter under advisement. On September 10, 2019, the trial court denied the motion to compel and ruled that Ms. Vergara would not need to respond to discovery pertaining to the UCCJEA.

On September 12, 2019, Appellants filed a motion to seal trial exhibits and requested that all exhibits introduced into evidence at the trial on the exceptions be placed under seal.

On September 16, 2019, the day of the hearing on Ms. Vergara's exceptions, Appellants took an emergency writ with this Court requesting a stay and consideration of the motion to compel. On the same day, a different panel of this Court denied the writ and the stay. In lieu of a contradictory hearing, the parties submitted the matter for consideration by the trial court, which took it under advisement. In submitting the matter, Ms. Vergara, offered, filed and introduced the following exhibits into evidence in support of her exceptions, which were admitted into evidence by the trial court: (1) the deposition transcript of Mr. Loeb and corresponding exhibits, taken on August 28, 2019; (2) the deposition transcript of Ms. Cathy Allyn Oved Beckerman and corresponding exhibits taken on August 30, 2019; (3) the deposition transcript of Mr. Brian Boudreaux and corresponding exhibits taken on April 5, 2019; (4) the deposition transcripts of Ms. Kristyn Rivera and corresponding exhibits taken on July 23, 2019, and August 9, 2019; (5) the affidavit of Ms. Bonnie May; and (6) the affidavit of Ms. Bonnie Buras dated December 12, 2018, and a corresponding exhibit.

On October 11, 2019, the trial court issued a judgment and reasons for judgment[13] granting all of the exceptions filed by Ms. Vergara, and dismissing,

---

[13] It is a "'well-settled rule that the district court's oral or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment.'" *Wooley v. Lucksinger*, 2009-0571, 2009-0589, 2009-0585, 2009-0586, p. 78 (La. 4/1/11), 61 So. 3d 507, 572 (quoting *Bellard v. American Cent. Ins. Co.*, 2007-1335, p. 25 (La. 4/18/08), 980 So. 2d 654, 671). However, a court of appeal may review the trial court's reasons for judgment to

with prejudice all claims filed by Appellants. The trial court further granted, in part, Appellants' motion to seal trial exhibits. In particular, the trial court granted the motion to seal only Exhibit 13, Kristyn Rivera's deposition. In all other respects, the trial court denied the motion to seal, "with the caveat that all evidence admitted at [the] trial of the exceptions on September 15, 2019[,] will remain sealed until the appeal period has expired."

It is from the trial court's judgment on the exceptions, the denial of Appellants' motion to compel, and the motion to seal that Appellants have filed the instant appeal.

## DISCUSSION

*Assignments of Error*

On appeal, Appellants raise the following assignments of error:

1. Whether the trial court erred in determining that it lacks subject matter jurisdiction under the UCCJEA over this child custody action;

2. Whether the trial court erred in determining that it lacked personal jurisdiction over the parties;

3. Whether the trial court erred in determining that Appellants failed to state a cause of action under the UCCJEA;

4. Whether the trial court erred in determining that Appellants do not have a right of action under the UCCJEA;

---

"gain insight" into the trial court's judgment. *Id.*, 2009-0571, p. 78, 61 So. 3d at 572; *See also Double NRJ Trucking, Inc. v. Johnson*, 2017-667, p. 7 (La. App. 5 Cir. 5/16/18), 247 So. 3d 1125, 1131.

5. Whether the trial court erred in determining that Human Embryo #3 HB-A and Embryo #4 HB-A lack procedural capacity under the Human Embryo Act;

6. Whether the trial court erred in determining that the custody action could not proceed without ART as a party;

7. Whether the trial court erred in determining that Plaquemines Parish is not [the] proper venue in the custody action;

8. Whether the trial court erred in granting *Lis Pendens* in favor of Ms. Vergara;

9. Whether the trial court erred in denying Appellants' discovery; and

10. Whether the trial court erred in denying Appellants' motion to seal.

## PRELIMINARY MATTER

Appellants list ten (10) assignments of error. Our discussion and analysis of the assignments will be addressed as follows: exceptions of lis pendens, venue, subject matter jurisdiction, personal jurisdiction and non-Joinder of party; and will conclude with addressing the trial court's ruling on the motion to compel.

However, before we delve into Appellants' substantive assignments of error, we must first address one procedural assignment of error.

### *Motion to Seal*

#### *Background*

Appellants assert that the trial court erred in denying their motion to seal. By way of background, on September 12, 2019, Appellants filed a motion to seal

trial exhibits with the trial court. In their motion, they specifically requested that the following exhibits be sealed: "AMEX[14] records, documents provided by Kristyn Rivera's[15] deposition pursuant to her deposition and subpoena duces tecum, Kristyn Rivera's deposition transcript, those portions of Nick Loeb's deposition transcript which refer [to] the documents provided by Kristyn Rivera, names [of] any business contacts, investors of his companies, names of his family members, disclose information regarding his movie 'Roe v. Wade,' and/or references [to] Nick's medical diagnosis or conditions; and those portions of Cathy Beckerman's deposition referencing the movie *Roe v. Wade*, investors of companies, names of business contacts, and names [of] her family members."[16]

In support of sealing the exhibits, Appellants assert three (3) primary arguments: (1) that this is a much publicized case and there is absolutely no purpose for the evidence concerning Mr. Loeb's domicile to be placed in the record, without a seal, for the public to see, because "[i]t'll be out there;"[17] (2) Mr. Loeb is completing a controversial film, "Roe v. Wade" and the film has been kept away from the public and even shot in secrecy; therefore, portions of Mr. Loeb and

[14] AMEX is referencing American Express credit card statements/charges.

[15] Ms. Rivera is a New York Certified Public Accountant, whose firm once provided accounting services to Mr. Loeb.

[16] Despite Appellants' reference to certain exhibits, their motion to seal was for *all* exhibits submitted at the hearing on the exceptions, and not just those specifically listed.

[17] In asserting this assignment of error, Appellants argue that they have an overriding interest in Mr. Loeb's privacy; however, in direct contravention of the laws that they have relied on in bringing the instant action, they revealed Ms. Vergara's identity. Louisiana Revised Statute 9:124 specifically mandates [t]he confidentiality of the [IVF] patient *shall* be maintained. (emphasis supplied). There was no attempt in this lawsuit, or the previously filed lawsuit before the 24th Judicial District Court to ever maintain the confidentiality of Ms. Vergara—the IVF patient.

Ms. Beckerman's depositions relating to the inner workings of the film should be kept under seal; and (3) Ms. Rivera's deposition transcript, and the financial records produced should be sealed pursuant to La. Code Evid. art. 515—the accountant-client privilege.

Conversely, Ms. Vergara asserts three (3) bases why the motion to seal should be denied: (1) Ms. Vergara asserts that the following have been redacted from all exhibits introduced at the exception hearing: social security numbers, AMEX and banking account numbers, personal health conditions, description of health treatments, Mr. Loeb's daughter's name, driver's license numbers, health insurance and member identification numbers, employer identification numbers and tax identification numbers; (2) Ms. Vergara argues that Mr. Loeb has caused the majority of the media attention regarding the litigation concerning the embryos and the filming of the "Roe v. Wade" movie. In support of this contention Ms. Vergara introduced into evidence documents evincing Mr. Loeb's media appearances, interviews, and an opinion editorial relating to the subject matter of this litigation—custody of the embryos—as well as the movie "Roe v. Wade"; albeit, some of the interviews were conducted prior to the institution of the current litigation;[18] (3) finally, Ms. Vergara asserts that pursuant to La. Code Evid. art.

---

[18] The following documents were introduced into evidence by Ms. Vergara in opposition to the Motion to Seal: (1) Nick Loeb [Op-ed], *Sofia Vergara's Ex Fiancé: Our Frozen Embryos Have a Right to Live*, N.Y. Times, Apr. 29, 2015; (2) *Sofia Vergara's Ex Speaks Out: Nick Loeb on Embryo Battle with Modern Family Star*, The Today Show, May 7, 2015; (3) *Battle Over Sofia Vergara's Frozen Embryos*, CNN, May 7, 2015; (4) *Tucker Carlson Interviews Nick Loeb about Roe v. Wade Movie,* Fox News, May 25, 2018; (5) Sasha Savitsky, *Nick Loeb says the backlash surrounding his abortion film is 'fake news'*, Aug. 1, 2018; (6) Paul Bond, *Secret 'Roe v. Wade' Film Now Shooting in New Orleans (Exclusive),* Hollywood Reporter, Jul 3, 2018, http://www.hollywoodreporter.com/news/secret-roe-v-wade-film-now-shooting-new-orleans-1124557; (7) Richard Johnson, *Nick Loeb says Facebook won't run ads for 'Roe v. Wade'*, Page

515 there is no recognized accountant-client privilege for an out of state accountant, i.e., she argues that La. Code Evid. art. 515 applies only to Louisiana accountants.

The trial court took the matter under advisement and on October 11, 2019, the trial court granted, in part, Appellants' motion to seal trial exhibits. In particular, the trial court granted the motion to seal only Exhibit 13, Ms. Rivera's deposition; in all other respects, the trial court denied the motion to seal, "with the caveat that all evidence admitted at the trial of the exceptions on September 15, 2019[,] will remain sealed until the appeal period has expired."

When the appeal record was lodged with this Court, the entire "record" was sealed, as opposed to only the exhibits as outlined in the trial court's judgment. Consequently, on June 23, 2020, Ms. Vergara filed a motion in this Court to unseal

Six, Jan 17, 2019, http://pagesix.com/2019/01/17/nick-loeb-says-facebook-wont-run-ads-for-roe-v-wade/; (8) Peter Sblendorio, *Nick Loeb promoting controversial pro-life 'Roe v. Wade' movie in Washington, D.C. amid March for Life*, NY Daily News, Jan 18, 2019, https://www.nydailynews.com/entertainment/movies/ny-ent-nick-loeb-march-for-life-20190117-story.html; (9) Jessilyn Lancaster, *'Roe v. Wade' Director Nick Loeb: We're Reaping the Rewards for Being on the Right Side*, Charisma News, Jan 16, 2019, http://www.charismanews.com/us/74819-roe-v-wade-director-nick-loeb-we-re-reaping-the-rewards-for-being-on-the-right-side; (10) Leah MarieAnn Klett, *'Roe v. Wade' director Nick Loeb shares pro-life conversion, says he dreams of 2 aborted babies,* The Christian Post, Apr 15, 2019, http://www.christianpost.com/news/roe-v-wade-director-nick-loeb-shares-pro-life-conversion-says-he-dreams-of-2-aborted-babies.html; (11)Jeannie Law, *Actor Nick Loeb urges men to lead fight against abortion,* The Christian Post, Feb 16, 2019, http://www.christianpost.com/news/actor-nick-loeb-urges-men-to-lead-fight-against-abortion.html; (12) Emily Smith, *Sofia Vergara demands Nick Loeb name exes who had abortions in ugly embryo battle,* Page Six, Nov 14, 2016, http://www.pagesix.com/2016/11/14/nick-loeb-would-rather-go-to-jail-than-reveal-exes-in-sofia-vergara-embryo-suit/; (13) Johnny Oleksinski, *Sofia Vergara's ex Nick Loeb still wants love, fame and a family*, NY Post, Apr 22, 2016, https://nypost.com/2016/04/22/sofia-vergaras-ex-nick-loeb-still-wants-love-fame-and-a-family/; (14) Sierra Marquina, *Nick Loeb Reacts to Sofia Vergara, Joe Manganiello's Engagement, Says His "Majestic" Ex "Deserves Happiness",* US Magazine, Dec 29, 2014, https://www.usmagazine.com/celebrity-news/news/nick-loeb-reacts-to-sofia-vergara-joe-manganiellos-engagement-20142912/

the record on appeal, including the evidentiary record submitted, with the exception of Exhibit 13, which the trial court in its judgment had specifically ordered sealed. In response to Ms. Vergara's motion, this Court requested a *per curiam* from the trial court. In its *per curiam* dated June 26, 2020, the trial court stated that it intended "that the entire record to be sealed throughout the appeal process, up to and including any writ application to the Louisiana Supreme Court." The trial court's *per curiam* expanded its original judgment to include the entire record. In response to the trial court's *per curiam*, a different panel[19] denied Ms. Vergara's motion to unseal the record.[20]

*Analysis*

We recognize that it is a "'well-settled rule that the district court's oral or written reasons for judgment form no part of the judgment, and that appellate courts review judgments, not reasons for judgment.'" *Wooley*, p. 77, 61 So. 3d at 572. The Louisiana Supreme Court has stated that "a *per curiam* filed after an appeal has been granted will not be considered." *State v. Brown*, 214 La. 18, 22; 36 So. 2d 624, 625 (La. 1948). Although the *per curiam* was used in a different manner in the *Brown* case than the purpose for which it is being utilized in the instant matter, the fact remains that it is being used to expand the clear language of the trial court's judgment, and it was filed after the appeal had already been lodged with this Court. Based on *Wooley*, we are specifically disallowed

---

[19] The writer of this opinion was one of the panel members.

[20] *Nick Loeb, et al. v. Sofia Vergara*, 2020-CA-0261

from reviewing anything other than the judgment issued by the trial court in determining the trial court's intentions.

Furthermore, in a Louisiana Supreme Court case dealing with public figures, as in the instant matter, Justice Johnson, in a concurrence, recognized that,

> The right of access to courts applies equally to all cases…in order to ensure that proceedings are conducted fairly to all concerned, to satisfy the people's right to know what happens in their courts, and to serve as a check on corrupt practices by exposing the judicial process to public scrutiny. See, *Globe Newspaper Co. v. U.S.,* 517 U.S. 1166, 116 S.Ct. 1564, 134 L.Ed.2d 664 (1996) (Mem).

*Copeland v. Copeland*, 2007-0177, p. 12 (La. 10/16/07), 966 So. 2d 1040, 1049.

In *Copeland*, the Louisiana Supreme Court was faced with a trial court's ruling that sealed an entire record filed in the couple's divorce proceedings. Ultimately, the Court employed the following balancing test to determine whether the record could remain sealed or should be unsealed:

> Considering the strong constitutional bias in favor of open access by the public to court proceedings, we find the trial court's blanket order sealing the entire record in this case to be overbroad. Although there may be some justification for sealing certain sensitive evidence in a proceeding, the parties have the burden of making a specific showing that their privacy interests outweigh the public's constitutional right of access to the record. The trial court, should it grant such relief, must ensure that its order is narrowly tailored to cause the least interference possible with the right of public access.

*Copeland*, 2007-0177, p. 2, 966 So. 2d at 1041-1042 (citing *Copeland v. Copeland,* 2006-1023 (La. 6/2/06), 930 So. 2d 940).

In applying the standard set forth in *Copeland,* and in consideration of the *Wooley* decision, we find that the order to seal the entire record and/or all of the exhibits filed at the hearing on the exceptions was not narrowly tailored, is unconstitutional, and violates the holdings of the *Copeland* and *Wooley* decisions. The steps taken by Ms. Vergara to redact personally identifiable information from all deposition transcripts and exhibits sufficiently protects Appellants' privacy interests, while still affording the public their protected right to access public records. Moreover, we find Appellants' reliance on maintaining privacy with regard to the anticipated "Roe v. Wade" film to be incredulous in light of the overwhelming evidence presented by Ms. Vergara evincing Mr. Loeb's interviews and media coverage, the majority of which were instituted by Mr. Loeb, wherein he discussed the production of and details associated with the impending film.

With regard to excluding the deposition of Ms. Rivera and its accompanying exhibits based on the accountant-client privilege, we find that La. Code Evid. art. 515 is fully applicable to the former business relationship between Ms. Rivera and Mr. Loeb.

Louisiana Code of Evidence Article 515 provides the following, in pertinent part:

> **B. General rule of privilege.** A client has a privilege to refuse or disclose, and to prevent another person from disclosing, a confidential communication, whether oral, written, or otherwise, made for the purpose of facilitating the rendition of professional accounting services to the client, as well as the perceptions, observations, and the like, of the mental, emotional, or physical condition of the client in connection with such a communication. This privilege includes the protection of other confidential information or material obtained by the

accountant from the client for the purpose of rendering professional services. This privilege exists when the communication is:

> (1) Between the client or a representative of the client and the client's accountant or a representative of the accountant.
> (2) Between the accountant and a representative of the accountant.
> (3) By the client or his accountant or a representative of either, to an accountant, or lawyer, or representative of an accountant or lawyer, who represents another party concerning a matter of common interest.
> (4) Between representatives of the client or between the client and a representative of the client.
> (5) Among accountants and their representatives representing the same client.
> (6) Between representatives of the client's accountant.

It is undisputed that Ms. Rivera is a Certified Public Accountant ("CPA") who is licensed in the State of New York. It is also undisputed that during all pertinent times, as a partner of her firm, she served as the assigned CPA for Mr. Loeb. Louisiana Code of Evidence Article 515(3) states, in pertinent part: "'Accountant' is the holder of a license issued pursuant to the Louisiana Accountancy Act and shall include all persons and entities within the definition of licensee in R.S. 37:73(8)." Louisiana R.S. 37:73(8) defines licensee as a person who is the "holder of a license." License as defined by the statute "means an active certificate of a certified public accountant pursuant to R.S. 37:73(3)," which defines active certificate as "a person who has met all requirements pursuant to the provisions of this Part, including the experience requirement. A holder of a valid active certificate is licensed to use the certified public account or CPA title in

Louisiana. Such a person is referenced in this Part as a licensee." Furthermore, in accordance with the guidelines set forth by the State Board of Certified Public Accountants of Louisiana,[21] "CPAs who are domiciled outside of Louisiana and who do not have a principal place of business in Louisiana qualify for and may exercise CPA practice privileges in Louisiana… [if] the CPA maintains his or her original valid active CPA license that was issued by a 'substantially equivalent state.'"[22]  "The 'practice privileges' allow the out of state CPA the same rights as a licensed CPA, that is, to use the CPA title in Louisiana and serve Louisiana clients." *Id.*

Contrary to Ms. Vergara's argument, we find that the accountant-client privilege espoused in La. Code Evid. art. 515 extends to the relationship between Ms. Rivera and Mr. Loeb.  However, pursuant to Section C(10) of that article we find that there is an exception to the accountant-client privilege; in particular Section C(10) states: "There is no privilege under this Article as to a communication: [i]n *any* domestic proceeding including the partition of community property and the settlement of claims arising from matrimonial regimes, spousal support, and child support." (emphasis added).  In *Travelers Ins. Co. v. Joseph*, the Louisiana Supreme Court stated the following as it relates to the definition of "include":

---

[21] Courts of appeal "may take judicial notice of governmental websites."  *Mendoza v. Mendoza*, 2017-0070, p. 6 (La. App. 4 Cir. 6/6/18), 249 So. 3d 67, 71 (citing *Felix v. Safeway Ins. Co.*, 2015-0701, p. 7 (La. App. 4 Cir. 12/16/15), 183 So. 3d 627, 632 & n. 10).

[22] See  http://cpaboard.state.la.us/non-resident-cpa-licensing-requirements/  and http://www.op.nysed.gov/prof/cpa/cpaclrlist.htm showing Louisiana as a state with significantly comparable licensure requirements to New York State.

23

> According to Black's Law Dictionary (5th ed. 1979), the generally prevailing meaning of the word "include" is as follows:
>
> > Term may, according to context, express an enlargement and have the meaning of *and* or *in addition to,* or merely specify a particular thing already included within general words theretofore used. "Including" within [a] statute is interpreted as a word of enlargement or of illustrative application as well as a word of limitation.

1995-0200, p. 6 (La. 6/30/95), 656 So. 2d 1000, 1003.

As applied in the above-referenced codal article, we find that the word "including" is illustrative when read in *pari materia* with the word "any."[23] Therefore, as it applies to the instant matter, we find that the exception to the accountant-client privilege applies. Appellants have styled this matter as a child custody case, which is a domestic proceeding and have repeatedly asserted it as a "custody matter." Thus, since Appellants view this matter as a "domestic" matter and since the Human Embryo Statutes that they rely on, in part state: "[i]f the [IVF] patients express their identity, then their rights as parents as provided under the Louisiana Civil Code will be preserved,[24] they cannot likewise request that Ms. Rivera's deposition be sealed pursuant to a codal article that clearly excepts the privilege in domestic matters.

We find Appellants' assignment of error is without merit. The trial court's judgment granting in part, and denying in all other respects Appellants' motion to

---

[23] According to Merriam-Webster.com one of the definitions for the word any is "one or more— used to indicate an undetermined number or amount." See https://www.merriam-webster.com/dictionary/any

[24] La. R.S. 9:126.

seal overrides a subsequent *per curiam* issued by the trial court. However, we find that the trial court abused its discretion when it ordered sealed Exhibit 13, and the sealing of all of the exhibits entered at the hearing on the exceptions, until all appeal delays have run.

We reverse the judgment of the trial court. We render judgment and order that the entire record be unsealed, with the exception of those portions of the trial record that have been redacted. The redactions contained in the record provide the privacy balance that Appellants need, while allowing the public's right of access to examine the remainder of the record to remain intact.

We now turn to Appellants' remaining assignments of error.

## DISCUSSION

### *Declinatory Exception of Lis Pendens*

Appellants assert that the trial court erred when it sustained Ms. Vergara's declinatory exception of *lis pendens*.

This Court, in *Dave v. Witherspoon,* explained that "[a] trial court's ruling on an exception of *lis pendens*, pursuant to La. C.C.P. art. 531, presents a question of law; thus, it is reviewed *de novo*. 2020-0239, pp.3-4 (La. App. 4 Cir. 11/04/20), ---So. 3d---, 2020 WL 6496161 (citations omitted). "[T]he standard of review of the appellate court in reviewing a question of law is whether the court's interpretive decision is legally correct." *Id.*

Pursuant to La. C.C.P. art. 925, *lis pendens* may be raised as a declinatory exception. The doctrine of *lis pendens* is set forth in La. C.C.P. arts. 531-532. The

25

exception of *lis pendens* "serve[s] to promote judicial economy and to prevent harassment." *Fincher v. Ins. Corp. of Am.*, 521 So. 2d 488, 489 (La. App. 4th Cir. 1988). When suits are pending in Louisiana courts, La. C.C.P. art. 531 applies and provides:

> When two or more suits are pending in a Louisiana court or courts on the same transaction or occurrence, between the same parties in the same capacities, the defendant may have all but the first suit dismissed by excepting thereto as provided in Article 925. When the defendant does not so except, the plaintiff may continue the prosecution of any of the suits, but the first final judgment rendered shall be conclusive of all.

When suits are pending in Louisiana and another state or a federal court, La. C.C.P. art. 532 governs and provides:

> When a suit is brought in a Louisiana court while another is pending in a court of another state or of the United States on the same transaction or occurrence, between the same parties in the same capacities, on motion of the defendant or on its own motion, the court may stay all proceedings in the second suit until the first has been discontinued or final judgment has been rendered.

As provided by La. C.C.P. art. 532, cmt. (c), La. C.C.P. art. 532 only applies when the suit in another state or in the federal court is filed first. While La. C.C.P. art. 531 provides for dismissal "of all but the first suit," La. C.C.P. art. 532 only permits a stay of the Louisiana suit until the pending action has been discontinued or final judgment rendered. *Amoco Prod. Co. v. Texas Gas Transmission Corp.*, 487 So. 2d 575, 576 (La. App. 4 Cir. 1986). As such, La. C.C.P. art. 532 does not permit a trial court to dismiss an action, rather it only permits the trial court the discretion to determine whether to stay proceedings. *Gulf Coast Mineral, LLC v.*

*Grothaus*, 2009-685, p. 7 (La. App. 3 Cir. 12/9/09), 26 So. 3d 909, 914. In summary, Justice Lemmon, in a concurring opinion, explained that

> The principal purpose of [La. C.C.P.] arts. 531 and 532 is to prevent a series of vexatious suits by the same plaintiff against the same defendant in the same transaction or occurrence in different forums. When such a series of suits are filed in Louisiana courts, [La. C.C.P. art.] 531 allows the defendant to have all but the first dismissed, but if the defendant fails to do so, the plaintiff may pursue any of the suits and a judgment in any is conclusive of all. When the first suits are in a federal or foreign court and the last is in a Louisiana court, [La. C.C.P. art.] 532 permits the Louisiana court in its discretion to stay proceedings in that suit.

*Sw. Elec. Power Co. v. Amax, Inc.*, 621 So. 2d 615 (La.1993). Here, La. C.C.P. art. 532 governs because suit was filed first in California by Ms. Vergara in 2017 and remains pending, and a second suit was later filed in Louisiana by Appellants, including Mr. Loeb in 2018.

*Lis Pendens – La. C.C.P. art. 532*

The trial court may grant an exception of *lis pendens* pursuant to La. C.C.P. art. 532 when a defendant proves:

> (1) that a suit was brought in a Louisiana state court during the pendency of a suit in a federal court or a court of a state other than Louisiana; (2) that the two suits are based on the same transaction or occurrence; and (3) that the two suits are between the same parties in the same capacities. If the defendant proves these three elements, the Louisiana court may stay the proceedings in that suit until the federal suit or the suit in the court of another state has either been discontinued or a final judgment has been rendered. *See Goldblum v. Boyd*, 267 So. 2d 610 (La. App. 2d Cir.1972), *writ refused,* 263 La. 243, 267 So. 2d 906 (1972). A Louisiana state court case can be stayed by a judgment granting an Article 532 exception of *lis pendens* only if another suit was filed prior to the filing of the Louisiana state court case either in federal court or in the court of another state.

27

*Brooks Well Servicing, Inc. v. Cudd Pressure Control, Inc.*, 36,723, p. 5 (La. App. 2 Cir. 6/27/03), 850 So. 2d 1027, 1031. This Court further explained that "[t]he test for deciding if an exception of *lis pendens* should be granted is to inquire whether a final judgment in the first suit would be res judicata in the latter. The exception of *lis pendens* has the same requirements of identities as the exception of res judicata." *Fincher*, 521 So. 2d at 489 (internal citations omitted).

"*Res judicata* is an issue preclusion device whose purpose is to promote judicial efficiency and final resolution of disputes by preventing needless relitigation." *Robert L. Manard, III, PLC v. Falcon Law Firm, PLC,* 2012-0147 p. 5 (La. App. 4 Cir. 11/16/12), 119 So. 3d 1, 4 (citing *Terrebonne Fuel & Lube, Inc. v. Placid Refining Co.,* [19]95-0654, [19]95-0671 (La. 1/16/96), 666 So. 2d 624, 631). There are five (5) criteria that must be met for a matter to be considered "*res judicata*: (1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation." *Id.* at 5 (citing *Burguieres v. Pollingue*, 2002-1385, p. 8 (La. 2/25/03), 843 So. 2d 1049, 1053).

### *Louisiana Suit Brought During Pendency of Foreign State Court Suit*

Here, a review of the record indicates that there are two suits pending: the suit filed by Ms. Vergara in California in February 2017, and the suit filed by Appellants, including Mr. Loeb, in Louisiana in January 2018. Thus, the

requirement of establishing that the second suit—the Louisiana lawsuit—was brought during the pendency of the first suit—the California lawsuit—is satisfied.

*Same Transaction or Occurrence*

This Court explained that "[n]o one test exists for determining what constitutes the same 'transaction or occurrence.' What constitutes a transaction or occurrence must be determined on a case-by-case basis." *TMF Hotel Properties, L.L.C. v. Crescent City Connections 501(C) 7 Gris-Gris Pleasure Aide & Soc. Club*, 2018-0079, p. 7, ---So. 3d---, 2018 WL 6204331, at *4 (La. App. 4 Cir. 11/28/18), *writ denied sub nom. T M F Hotel Properties, L.L.C. v. Crescent City Connections 501(c) 7 Gris-Gris Pleasure Aide & Soc. Club*, 2019-0110 (La. 3/18/19), 267 So. 3d 87 (quoting *Parker v. Tulane-Loyola Fed. Credit Union*, 2015-1362, p. 7 (La. App. 4 Cir. 5/25/16), 193 So. 3d 441, 445). Further, this Court in *Krecek v. Dick*, discussed the meaning of the phrase "transaction or occurrence" as contemplated by *Hy-Octane Investments, Ltd v. G & B Oil Products, Inc.*, 1997-28, p. 5 (La. App. 3 Cir. 10/29/97), 702 So. 2d 1057, 1060, as follows:

> The term "transaction or occurrence" is used in seven articles of the Code of Civil Procedure. In addition to its use in Article 1061, it is found in Article 425, which deals with preclusion by judgment; it is used in Articles 531 and 532, both dealing with *lis pendens;* in Article 891, the term enumerates one of the required formalities of a petition; in Article 1071 it defines the parameters of a cross-claim; and in Article 4845, the term helps define the jurisdictional limits of city and parish courts. Another provision, Article 1153, uses the slightly different expression "conduct, transaction, or occurrence" as part of the formula for when an amendment to a pleading relates back for prescription purposes.

Although none of these articles specifically define the expression "transaction or occurrence," they variously equate the term with "the subject matter of the litigation" (Articles 425 & 891), "the subject matter of the principal action" or "principal demand" (Article 1061 & 4845), and "the subject matter either of the original action or a reconventional demand or relating to any property that is the subject matter of the original action" (Article 1071). What the transaction or occurrence is that is the subject matter of the litigation, or the principal demand or action, or the original action, has been determined on a case-by-case basis, according to the annotations under these articles.

Some definitions are available, however. Black's Law Dictionary defines "transaction" as, *inter alia*, "a broader term than 'contract,'" and "a group of facts so connected together as to be referred to by a single legal name; as a crime, a contract, a wrong." Among the definitions of "transaction or occurrence" found in 42 Words and Phrases, Supp. p. 201 (1997), is "whether pertinent facts of different claims are so logically related that issues of judicial economy and fairness mandate that all issues be tried in one suit." The federal courts have given the words "transaction or occurrence" a broad and liberal interpretation in order to avoid a multiplicity of suits. All logically related events entitling a person to institute legal action against another generally are regarded as comprising a "transaction or occurrence." *Lasa Per L'Industria Del Marmo Soc. Per Azioni v. Alexander,* 414 F.2d 143 (6th Cir.1969).

2013-0804, p. 5 (La. App. 4 Cir. 2/19/14), 136 So. 3d 261, 264-65.

This Court, in *Parker*, explained:

For *res judicata* purposes, Louisiana courts, in determining whether the "transaction or occurrence" element is satisfied, have borrowed the "transaction or occurrence" test employed by federal courts in determining whether a counterclaim is compulsory under Fed.Rule Civ.P. 13(a). *See Zen–Noh Grain Corp. v. Thompson,* [20]13-110, p. 5 (La. App. 5 Cir. 8/27/13), 123 So. 3d 777, 779 (citing *Durkin v. Quest, Inc.,* [19]98-939 (La. App. 5 Cir. 12/29/98), 724 So. 2d 868, citing *Park Club, Inc. v. Resolution Trust Corp.,* 967 F. 2d 1053 (5th Cir.1992)). In that context, the following four different "transaction or occurrence" tests have been suggested:

(1) Are the legal and factual issues raised by the claim and counterclaim largely the same?

(2) Would res judicata bar a later suit on the counterclaim in the absence of the compulsory-counterclaim rule?

(3) Will substantially the same evidence support or refute both the plaintiff's claim and the counterclaim?

(4) Are the claim and counterclaim logically related?

Bryan Garner, BLACK'S LAW DICTIONARY, 1535 (9th ed.2009).

2015-1362, pp. 8-9, 193 So. 3d at 446. An affirmative answer to any of the four questions indicates the counterclaim is compulsory and likewise whether the "transaction or occurrence" element has been satisfied.

Here, both suits involve the disposition of the cryopreserved embryos. In the California suit, Ms. Vergara seeks a declaratory judgment and injunctive relief; she also asserts claims consisting of: breach of contract, promissory fraud, promissory estoppel, and malicious prosecution. The suit seeks to enforce the terms of the contract and enjoin Mr. Loeb from continuing legal action in the attempt to bring the embryos to term without her express consent and in violation of the contract. In the Louisiana suit, Appellants allege that the embryos are human beings with a right to life, and Mr. Loeb seeks sole and full custody (or as asserted by Ms. Vergara—ownership) of the embryos to bring them to term in contravention of the contract that the parties entered into in California.

While the focus of the California suit is the contract and the focus of the Louisiana suit is the custody of the embryos, both suits relate to the creation of embryos at ART and involve the right of custody and control of the embryos. Accordingly, the two suits are interconnected and/or logically related for purposes

of *lis pendens*. Moreover, it appears that the contract would be offered to both support Ms. Vergara's claims in the California suit and refute Appellants' claims in the Louisiana suit; thus, the same evidence would be used in both suits. Further, a final judgment in the California lawsuit would constitute *res judicata* in the Louisiana lawsuit; thus, preventing Mr. Loeb from asserting rights over the embryos without Ms. Vergara's consent as expressly stated in the ART contract. For those reasons, we find that both lawsuits stem from the same transaction and occurrence as contemplated by La. C.C.P. art. 532 and satisfy this element.

*Same Parties*

The final requirement is that the two suits involve the same parties in the same capacities. In *TMF*, this Court noted that the "same parties" requirement has been equated with the "identity of parties" requirement for *res judicata. TMF Hotel Properties, L.L.C.*, 2018-0079, p. 10, ---So. 3d---, 2018 WL 6204331, at *6 (internal citations omitted). The Court further explained:

> The "identity of parties" requirement for *res judicata* does not require that the parties be the same physical or material parties "so long as they appear in the same quality or capacity." *Revel, supra.; Welch v. Crown Zellerbach Cor*p., 359 So. 2d 154, 156 (La. 1978) (observing that an identity of parties exists "whenever the same parties, their successors, or others appear so long as they share the same 'quality' as parties")."The only requirement is that the parties be the same 'in the legal sense of the word.'" *Id*. (quoting *Berrigan, supra*).
>
> A person has the same "quality" when he or she appears in the same capacity in both suits or when he or she is privy to a party in the prior suit. *Burguieres v. Pollingue,* [20]02-1385, p. 8, n. 3 (La. 2/25/03), 843 So. 2d 1049, 1054 (citing *Welch*, 359 So. 2d at 156, and observing that "identity of parties" means that "the parties must appear

in the same capacities in both suits" but that "[i]dentity of parties can also be satisfied when a privy of one of the parties is involved"). "Privy," in this context, has been defined as encompassing "representatives and successors, including any person having a legal right or interest in the subject matter of the prior suit derived through succession or assignment from the litigant who asserted the right; or any person whose legal right or interest in the subject matter of the prior suit was asserted by his legal representative." *Furie Petroleum Co., L.L.C. v. SWEPI, LP*, 49,462, pp. 11-12 (La. App. 2 Cir. 11/19/14), 152 So. 3d 255, 262.

Summarizing the federal rule on identity of parties, this court, in *Armbruster v. Anderson,* [20]18-0055, p. 11 (La. App. 4 Cir. 6/27/18), 250 So. 3d 310, 318, recently observed:

For purposes of federal *res judicata*, the contours of the requirement that the parties be the same have been defined as follows:

"[P]arties" for purposes of *res judicata* does not mean formal, paper parties only, but also includes "'parties in interest, that is, that persons whose interests are properly placed before the court by someone with standing to represent them are bound by the matters determined in the proceeding.'" (quoting 1B J. *Moore, Moore's Federal Practice, P.O.* 411[1] at 390-391 (2d ed. 1983)) (emphasis supplied). A non-party is in privity with a party for *res judicata* purposes in three instances. First, if he has succeeded to the party's interest in property, he is bound by prior judgments against the party. Second, if he controlled the prior litigation, he is bound by its result. Third, he is bound if the party adequately represented his interests in the prior proceeding.

*Armbruster, supra* (quoting *Latham v. Wells Fargo Bank, N.A.*, 896 F.2d 979, 983 (5th Cir. 1990)).

*Id.* at *6-7.

Here, the parties to the California suit include Ms. Vergara, Mr. Loeb, ART, and "Doe 1 through Doe 20." In the suit, Ms. Vergara alleges that she does not know the true names and capacities of the defendants sued as Doe 1-Doe 20 and

"therefore sued the defendants by fictitious names pursuant to Code of Civil Procedure § 474" and alleges that they are "responsible in some manner for the occurrences and causes of the action alleged" in the complaint.[25] The parties to the Louisiana suit include Ms. Vergara, Mr. Loeb, and the embryos. Although the embryos are not parties to the California suit, they were created and are currently stored at ART, a named party in the suit. Furthermore, under Louisiana Law, in particular Louisiana Revised Statute 9:127 "any…medical facility who causes [IVF] of a human ovum in vitro will be directly responsible for the [IVF] safekeeping of the fertilized ovum." Thus, the presence of ART is sufficient to

---

[25] Section 474 of the California Civil Code of Procedure provides:

> When the plaintiff is ignorant of the name of a defendant, he must state that fact in the complaint, or the affidavit if the action is commenced by affidavit, and such defendant may be designated in any pleading or proceeding by any name, and when his true name is discovered, the pleading or proceeding must be amended accordingly; provided, that no default or default judgment shall be entered against a defendant so designated, unless it appears that the copy of the summons or other process, or, if there be no summons or process, the copy of the first pleading or notice served upon such defendant bore on the face thereof a notice stating in substance: "To the person served: You are hereby served in the within action (or proceedings) as (or on behalf of) the person sued under the fictitious name of (designating it)." The certificate or affidavit of service must state the fictitious name under which such defendant was served and the fact that notice of identity was given by endorsement upon the document served as required by this section. The foregoing requirements for entry of a default or default judgment shall be applicable only as to fictitious names designated pursuant to this section and not in the event the plaintiff has sued the defendant by an erroneous name and shall not be applicable to entry of a default or default judgment based upon service, in the manner otherwise provided by law, of an amended pleading, process or notice designating defendant by his true name.

Additionally, Doe-1-20 are fictitious names and do not constitute real persons and thus are not actually parties to the California suit. *See Schlumbrecht v. Exec. Officers of Brown & Root, Inc.,* 371 So. 2d 389, 390 (La. App. 4 Cir. 1979) (recognizing that a fictitious name was not real person); *Hennessey Const. Corp. v. Halpern*, 2003-1935, p. 5 (La. App. 4 Cir. 6/23/04), 879 So. 2d 340, 343 (naming a fictitious defendant did not interrupt prescriptive period).

adequately represent the embryos' interests. Moreover, the outcome of a judgment against ART in California would affect the fate and status of the embryos in Louisiana. Thus, the parties in both lawsuits share the same quality or capacity; accordingly, the "same parties" element is satisfied.

Based on the aforesaid, we find that the trial court did not err in granting the declinatory exception of *lis pendens* in favor of Ms. Vergara.

*The trial court's authority pursuant to La. C.C.P. art. 532*

Although we find that the trial court correctly granted the exception of *lis pendens* in favor of Ms. Vergara, we write further to clarify that La. C.C.P. art. 532 vests the trial court with the discretion to *stay*, not dismiss, the Louisiana proceedings. La. C.C.P. art. 523, cmt. (b).

This Court in *Amoco Prod. Co.,* 487 So. 2d at 576, concluded that the trial court exceeded its authority by dismissing the Louisiana proceeding where another suit was pending in Kentucky. In *Amoco Prod. Co.*, the plaintiff filed suit seeking a declaratory judgment and specific performance under two gas purchase contracts, and the defendant filed an exception of *lis pendens* arguing that it had already initiated litigation on the same contracts before a Kentucky state court. *Id.* at 575. The trial court maintained the defendant's exception of *lis pendens* and dismissed the plaintiff's suit. *Id.* On appeal, this Court found that the trial court had exceeded its authority in dismissing the Louisiana suit, reversed the trial court's decision, and remanded the case for further proceedings consistent with the opinion. *Id.* at 576. This Court explained, in relevant part, that:

Code of Civil Procedure article 532 governs the use of *lis pendens* when a suit has been previously filed in a federal or foreign court. This article allows the trial judge to stay the proceedings in the Louisiana court until the pending action has been discontinued or a final judgment has been rendered.

The declinatory exception of *lis pendens* is also governed by Code of Civil Procedure articles 925 and 932. Article 925 simply states that *lis pendens* may be raised as a declinatory exception. Article 932 provides that if the grounds of objection raised by the declinatory exception cannot be removed or if not removed as ordered, then the court shall dismiss the action. Defendant, TGT, relies upon these articles in arguing that the trial judge acted within his authority in dismissing the action.

It is evident that a conflict exists in regards to the authority of a trial judge to dismiss an action on the basis of *lis pendens* when the first action is before a federal or foreign court. The comments under the articles in question assist in resolving the conflict. Comment (b) under Code of Civil Procedure article 925 states that one should look to articles 531 and 532 for an explanation of the function and scope of the objection of *lis pendens*. Article 531, which deals with the use of *lis pendens* when two or more suits have been filed in Louisiana courts, refers to C.C.P. article 932 and grants the trial judge the authority to dismiss all but the first action filed. Article 532 does not refer to, nor incorporates C.C.P. article 932. This obvious omission on the part of the Legislature clearly reflects an intent to limit the trial court's discretionary powers. Further, [c]omment (b) under C.C.P. article 532 states that the trial judge has the discretion to stay or not to stay the proceedings in the Louisiana case. Thus, it is evident that the Legislature intended to limit the trial court's authority to a determination of whether to stay or not to stay Louisiana proceedings when a suit is pending in a federal or foreign court on the same cause of action, between the same parties in the same capacities, and having the same object. We conclude that dismissal of an action under [La. C.C.P. art.] 932 is not applicable when an exception of *lis pendens* is maintained in accordance with C.C.P. article 532.

*Id*. at 576.

36

Similar to the defendant in *Amoco Prod. Co.*, Ms. Vergara filed an exception of *lis pendens* pursuant to La. C.C.P. art. 531;[26] however, because this matter involves a suit pending in California, as well as a later filed suit pending in Louisiana, La. C.C.P. art. 532 governs. As provided in La. C.C.P. art. 532, the trial court is vested with the discretion to stay, not dismiss, the later filed Louisiana proceedings. Thus, pursuant only to the exception of *lis pendens* the Louisiana proceedings should be stayed pending the discontinuation of, or a final judgment in the California proceedings.

For all of the forgoing reasons, we find Appellants' eighth (8th) assignment of error to be without merit and to the extent that the trial court's judgment dismissed the instant litigation pursuant to the exception of *lis pendens,* we reverse that portion of the trial court's judgment. Based upon the remaining assignments of error, however, it is not legally necessary for us to stay the proceedings.

***Declinatory Exception of Improper Venue***

Appellants aver that the trial court erred in sustaining Ms. Vergara's declinatory exception of improper venue. In support of their contention, they assert that under Louisiana Code of Civil Procedure article 74.2(A) venue is proper in Plaquemines Parish.

"This Court has held that '[e]xceptions of improper venue are reviewed using the *de novo* standard of review, as venue is a question of law.'" *Bruno v.*

---

[26] Additionally, Appellants, in their appellate brief, and the trial court, in its written reasons for judgment, erroneously cited La. C.C.P. art. 531 as the applicable article for *lis pendens* in this matter.

*CDC Auto Transport, Inc.*, 2019-1065, p. 7 (La. App. 4 Cir. 6/3/20), 302 So. 3d 8, 12, *writ denied,* 2020-00836 (La. 10/14/2020), 302 So. 3d 1118 (Mem.) (quoting *Matthews v. United Fire & Casualty Insurance Company Doctor Pipe, Inc.,* 2016-0389, p. 3 (La. App. 4 Cir. 3/8/17), 213 So. 3d 502, 505). "We are allowed to 'render judgment on the record without deference to the legal conclusions of the [trial court].'" *Id.* (citing *Land v. Vidrine*, 2010-1342, p. 3 (La. 3/15/11), 62 So. 3d 36, 39 (citations omitted)). In applying our *de novo* standard of review to the instant assignment of error, for the foregoing reasons, we find that the trial court did not err in sustaining the exception of venue as to the Appellants.

Louisiana Code of Civil Procedure article 41 defines venue as "the parish where an action or proceeding may be properly brought and tried under the rules regulating the subject." The general venue article states that "an action against…[a]n individual who is domiciled in the state shall be brought in the parish of his domicile; or if he resides but is not domiciled in the state, in the parish of his residence." La. C.C.P. art. 42. "The general rules of venue provided in article 42 are subject to the exceptions provided in [articles 71 through 85] of this Code and as otherwise provided by law." La. C.C.P. art. 43. This Court, in *French Jordan, Inc. v. Travelers Insurance Company*, explained:

> The Louisiana Supreme Court has established that the alternative optional venue provisions contained in La. C.C.P. articles 71 through 85 are an extension, supplement and legal part of the provisions of article 42. As a result, these alternative venue provisions are no longer exceptions to Article 42's 'home base' venue that should be strictly construed as was formerly required under *Hawthorne Oil & Gas v. Continental Oil,* 377 So. 2d 285 (La. 1979), but rather, these alternative provisions

are part and parcel of the general venue rule set forth in Article 42. *Kellis v. Farber*, 523 So. 2d 843, 846 (La. 1988), superseded by statute on other grounds. *Boatwright v. Metropolitan Life Ins.*, 95-2473 (La. App. 4 Cir. 3/27/96), 671 So. 2d 553. The Court went on to say:

> The proliferation of exceptions mirrors the newly emerging bases of modern venue statutes. These provisions are not based on domicile but on factors such as the following: the convenience of both parties; the relationship between the forum and the cause of action; the reduction of litigation through certainty in layering of venue; the places where the subject of action or part thereof is situated; the place where the cause of action arose; the place where the seat of government is located…compare with La. C.C.P. art. 72 (place of property), article 73 (solidary obligation) article 74 (place of tort), article 74.1 (place of child's birth), article 75 (court where the bond was filed), article 77 (place of business office), article 81 (court where succession is pending), article 82 (place where the community was dissolved or where immovable property is located).

2007-0007, p. 6-7 (La. App. 4 Cir. 4/25/07), 958 So. 2d 699, 704 (citing *Kellis,* 523 So. 2d at 847).

Appellants assert that article La. C.C.P. art. 74.2(A) provides the basis for venue in the instant matter, which states: "[a] proceeding to obtain the legal custody of a child or to establish an obligation of support may be brought in the parish where a party is domiciled…." They assert that Plaquemines Parish is the proper domicile for the current litigation, because it is the parish where one of the Appellants, the purported "father" of the embryos is domiciled and/or a resident thereof—Mr. Loeb.

"When utilizing any of the exceptions to the general venue provisions the plaintiff must show that the facts clearly satisfy the exception before claiming the

benefit of that exception." *French Jordan, Inc.*, 2007-0007, p. 5, 958 So. 2d at 703

(citation omitted). "For purposes of the venue exception, the plaintiff's allegations

are taken as true and must appear on the face of the plaintiff's petition." *Id.* (citing

*Cacamo v. Liberty Mutual Fire Ins. Co.,* [19]99-3479 (La. 06/30/00), 764 So. 2d

41).

In Appellants' first petition, filed on January 9, 2018, under the section

entitled, "Jurisdiction and Venue," they allege the following, in pertinent part:

> 4.
> Mr. Loeb is currently domiciled in Plaquemines Parish, Louisiana, and has a habitual residence and an intent to remain there…[.]
> 5.
> Mr. Loeb leases his residence with Plaquemines Parish, Louisiana, and has applied to register to vote there.
>
> \*    \*    \*
>
> 6.
> Mr. Loeb had been an owner of a business, has paid taxes in Louisiana and conducted business in Louisiana for over fifteen years.
> 7.
> Mr. Loeb was a graduate of Tulane University and has been and is a volunteer police with Plaquemines Parish, Louisiana.

Once the matter was removed to federal court, Appellants amended their

complaint.[27] They reiterated the jurisdiction and venue paragraphs in substance as

enumerated herein-above, but added the following additional, pertinent language

relating to domicile/venue:

> 11.
> The 25th Judicial District Court for the State of Louisiana has status jurisdiction under La. Code Civ. Proc. art. 10(A)(5) over this proceeding to obtain custody

---

[27] "Complaint" and "petition" relate to the same type of pleading, the former is the title used in federal court, while the latter is the title that is used in state courts in Louisiana.

of minors domiciled in the State of Louisiana. "Minor children have no domicile other than that of the parents." [fn. omitted]. "The domicile of an unemancipated minor is that of the parent or parents with whom the minor usually resides." La. Code Civ. Proc. art. 41. [fn. omitted]. Although Emma and Isabella are being housed in a facility in California, Emma and Isabella are domiciled in the State of Louisiana, the domicile of their father....

\* \* \*

13.

The 25th Judicial District Court for the State of Louisiana is the proper venue for this matter under La. Code Civ. Pro. art. 74.2(A) which states, "A proceeding to obtain the legal custody of a minor or to establish an obligation of support may be brought in the parish where a party is domiciled." Mr. Loeb, Emma and Isabella are all domiciled in Plaquemines Parish, Louisiana and are parties to this lawsuit.

14.

The 25th Judicial District Court for the State of Louisiana has jurisdiction over this action under the UCCJEA, La. Rev. Stat. §§13:801-22 because:

...

> (c) Mr. Loeb is a resident and domiciled in the State of Louisiana;
> (d) Having personal jurisdiction over Defendant is not necessary when Louisiana has jurisdiction over the status of Emma and Isabella because this is a child custody proceeding and Emma and Isabella's domicile is Louisiana.

...

Because the bare allegations of Appellants' petition and amended complaint establish facts that clearly support the application of the exception to the general venue rule, the burden then shifts to Ms. Vergara to show why Appellants should not enjoy the utilization of the exception and maintenance of the lawsuit should not remain in Plaquemines Parish.

In support of her declinatory exception of improper venue Ms. Vergara argues first, that this is not a custody matter; therefore, any exception to the general

venue rules should not apply; second, that Mr. Loeb is not domiciled or resides in Louisiana; and third, that Appellants do not have any significant connection(s) to the State of Louisiana. In support of her exception, Ms. Vergara engaged in extensive discovery. The discovery included, but was not limited to, obtaining affidavits of Mr. Loeb's former and current landlords, propounding interrogatories and requests for production of documents, issuing subpoenas, and deposing the following persons: Mr. Loeb, Ms. Rivera, Mr. Brian Boudreaux, and Ms. Cathy Allyn Oved Beckerman.

On September 16, 2019, the trial court held a hearing on, *inter alia*, the exception of venue filed by Ms. Vergara. In lieu of an oral contradictory hearing, the parties agreed to "submit" the matter to the trial court. In submitting the matter to the trial court, Ms. Vergara entered into evidence all of the discovery obtained during the jurisdictional phase of the litigation to support her exception of venue, among the other exceptions filed with the trial court.

In determining whether the trial court was correct in sustaining the exception of venue, we must analyze whether Mr. Loeb was domiciled in Plaquemines Parish and/or whether Mr. Loeb resided in Plaquemines Parish at the time the lawsuit was filed, irrespective of whether venue is appropriate under the general venue rules or an exception to the general venue rules.

In reviewing whether the trial court was correct in finding that Appellants are not domiciled in and are not residents of Plaquemines Parish, this Court is guided by *Ellison v. Romero*, wherein this Court explained that "we are guided by

the standard of review that a trial judge's conclusion regarding a person's domicile (or change of domicile) is 'clearly a factual finding subject to the manifest error standard of review.'" 2020-0376, p. 12 (La. App. 4 Cir. 8/11/20), ---So. 3d---, 2020 WL 459285, *writ denied*, 2020-01000 (La. 8/17/20), 300 So. 3d 875 (citing *Steinhardt v. Batt*, 00-0328, p. 2 (La. App. 4 Cir. 2/11/00), 753 So. 2d 928, 930).

Furthermore, this Court, in *Ogden v. Gray*, explained that

> The terms "residence" and "domicile" are legal terms that are not synonymous. *Landiak,* p. 8, 899 So. 2d at 542; *Becker,* p. 10, 854 So.2d at 871. The most significant difference between the two concepts is that a person can have several residences, but only one domicile. *Id.* Domicile is an issue of fact that must be determined on a case-by-case basis. *Landiak, id.; Darnell v. Alcorn,* 99-2405, p. 5 (La. App. 4 Cir. 9/24/99), 757 So.2d 716, 719. 2012-1314, p. 4 (La. App. 4 Cir. 9/11/12), 99 So. 3d 1088, 1092.
>
> La. C.C. art. 38 provides that: "[t]he domicile of a natural person is the place of his habitual residence," whereas La. C.C. art. 39 states: "[a] natural person may reside in several places but may not have more than one domicile. In the absence of habitual residence, any place of residence may be considered one's domicile at the option of persons whose interests are affected." Finally, La. C.C. art. 44 reads: "[d]omicile is maintained until acquisition of a new domicile. A natural person changes domicile when he moves his residence to another location with the intent to make that location his habitual residence."
>
> Louisiana case law has traditionally held that domicile consists of two elements: residence and intent to remain. *Landiak,* p. 9, 899 So. 2d at 542; *Becker,* p. 10, 854 So. 2d at 871; *Russell,* p. 5, 780 So. 2d at 1051. When a party has not declared his intention in the manner prescribed by La. C.C. art. 42,[28]

---

[28] At the time of the *Landiak* decision in 2005, La. C.C. art. 42 addressed proof of intent regarding domicile by written declaration and provided as follows:

proof of a person's intention regarding domicile "shall depend upon circumstances." La. C.C. art. 43; *Landiak, id.* Determination of a party's intent to change his or her domicile must be based on the actual state of the facts, not simply on what the person declares them to be. *Landiak,* p. 9, 899 So. 2d 543, citing *Davis v. Glen Eagle Ship Management Corp.,* 97-0878, p. 2 (La. App. 4 Cir. 8/27/97), 700 So. 2d 228, 230.

The case law regarding domicile reveals that Louisiana courts commonly consider a number of different factors when trying to determine domicile in fact. Because domicile is generally defined as residence plus intent to remain, a party's uncontroverted testimony regarding his intent *may* be sufficient to establish domicile, in the absence of documentary or other objective evidence to the contrary. However, in the absence of a formal declaration of domicile, when documentary or other objective evidence casts doubt on a person's statements regarding intent, courts must weigh the evidence presented in order to determine domicile-in-fact, lest the legal concept of domicile be rendered meaningless and every person would be considered legally domiciled wherever he says he is domiciled. *Landiak,* p. 10, 899 So. 2d at 543. Some of the types of documentary evidence commonly considered by courts to determine domicile-in-fact include such things as (a) voter registration, (b) homestead exemptions, (c) vehicle registration records, (d) driver's license address, (e) statements made in notarial acts, and (f) evidence that most of the person's personal property is housed at a particular location. *Landiak,* pp. 10-11, 899 So. 2d at 543-44.

2012-1314, pp. 4-6 (La. App. 4 Cir. 9/11/12), 99 So. 3d 1088, 1092-93.

---

This intention is proved by an express declaration of it before the recorders of the parishes, from which and to which he shall intend to remove.

This declaration is made in writing, is signed by the party making it, and registered by the recorder.

However, La. C.C. art. 42 now addresses the domicile of an interdict.

Domicile is determined by habitual residence and intent to remain. Further, a change in domicile "require[s] 'the physical presence of the individual in the new domicile coupled with a present intent to permanently reside in the new domicile.'" *Scaglione v. Juneau*, 2010-1109, p. 5 (La. App. 4 Cir. 8/4/10), 45 So. 3d 191, 195 (citations omitted); *Imbraguglio v. Bernadas*, 2007-1220, p. 5 (La. App. 4 Cir. 9/21/07), 968 So. 2d 745, 748-49. Importantly, "the expressed intent of the party may be at variance with the intent as evidenced by conduct." *Letulle v. New Orleans Police Dep't*, 2003-0617, p. 8 (La. App. 4 Cir. 12/10/03), 863 So. 2d 612, 617. Courts have disregarded expressed intent when it is unaccompanied by conduct consistent with that expressed intent. *Id*.

The evidence submitted in support of the exception of venue overwhelmingly supported the trial court's conclusions that Appellants are not domiciled in Plaquemines Parish, or any parish in the State of Louisiana: they are not residents of Plaquemines or any parish in the State of Louisiana; and they do not possess an intent to be domiciled in or residents of Plaquemines or any parish in Louisiana. The following was deduced from the evidence presented at the hearing on the exceptions:

*Mr. Loeb's Deposition Testimony*

The deposition transcript of Mr. Loeb was admitted into evidence as Exhibit 1 in support of Ms. Vergara's exceptions. Mr. Loeb's deposition was taken on August 28, 2019, in the presence of Ms. Jalesia McQueen and Mr. Pierre Miller, II,

attorneys for Appellants, and conducted by Mr. Kyle Schonekas, Ms. Ellie Schilling, and Mr. Fred Silberberg, attorneys for Ms. Vergara.

Regarding his residence, Mr. Loeb acknowledged the following email exchange between himself and Ms. Rivera on October 13, 2017:

> **Mr. Loeb:** "Would that count then?"
> **Ms. Rivera:** "You have no Louisiana losses to offset. I thought you were moving to Spain for two-three years."
> **Mr. Loeb:** "I am, but I may create a residency in Louisiana for another legal matter."

Ms. Rivera questioned Mr. Loeb whether his attorney wanted him to be a Louisiana resident for tax purposes, otherwise she suggested he would be a part-year Florida and part-year out of country resident for the years 2017 and 2018. However, he told her that "for my lawsuit, I have to be a resident [of Louisiana] to be able to file."

Mr. Loeb stated that he executed a lease originally from December 2017 through December 2018, then it was amended to November 2017 for a residential property located at 110 Protti in Belle Chasse, Louisiana. He admitted that the whole purpose for leasing the Protti property was to be able to file a lawsuit in Plaquemines Parish against Ms. Vergara. He could not recall who his landlord was, if his claim of residency began with this lease and if anyone checked for mail at that address. But he unequivocally stated that he never spent one night at that property.

He also acknowledged that he was not a commissioned volunteer officer with the Plaquemines Parish Sheriff's Office because he was asked to return his

weapon since he had not been volunteering for a while. He further admitted that he never engaged in any police work since prior to obtaining the lease for the Protti property, which is contrary to the allegations contained in his petition for custody filed in this matter.

He stated that from April 27, 2018 through part of July 2018, he leased several apartment units in Baton Rouge for Ms. Cathy Beckerman, himself and his daughter's nanny.

He acknowledged the contents of an email exchange dated July 10, 2018, between Mr. Brian Boudreaux and him pertaining to the Protti property that stated the following:

> **Mr. Boudreaux:** "We're going there this weekend and put some stuff in there to make it look like you spent a night or two there. You'd have supplies like bath towels, utensils, toilet paper, soap, etc. We're also going to put sheets and pillows in your bed and hang a couple of pics up just in case. Never know what a [j]udge may decide to do if he sees – to see if it's legit. Better safe than sorry."
> **Mr. Loeb:** "Okay, great, thanks so much."

Beginning in August 2018, through August 2019, he stated that he rented an apartment at 114 Zeta Drive, Unit C, in Belle Chasse, Louisiana. He admits that the utilities were cut-off for a period of three (3) months for nonpayment and that during the same period he spent 300 days with his daughter and her mother in Italy, but could not recall how many days he resided with them when they visited Plaquemines Parish. He likewise could not recall how many nights he had ever spent at the Zeta property and did not recall the name of the Hurricane that affected

47

Plaquemines Parish—he was not there and indicated that he spoke with someone who told him his apartment was fine.

Mr. Loeb admits that all of his doctors, as well as his pharmacy, are located in New York. He also admits that his business manager is located in New Jersey. He does not have any banking accounts in Plaquemines Parish and has never used his Automated Teller Machine ("ATM") card in Plaquemines Parish. Likewise, despite his statements to the contrary, his American Express detailed statement transaction history does not show *any* transactions in Plaquemines Parish for the period of 2017 through 2019.

Mr. Loeb acknowledged the contents of an email dated August 28, 2018, which pertained to Mr. Loeb trying to insure his yacht. The compliance department, in conducting due diligence, pulled a picture of the Protti property, the location that he was trying to use as his address and told Ms. Rivera's assistant that "it did not appear to be a residential address as the house look dilapidated and unoccupied." The compliance department asked if there was "an alternate address." Because the Zeta Drive address was too new, and Mr. Loeb did not have any utility bills associated with it in his name that address could not be used either. Ultimately, they used the address of Mr. Loeb's New York City apartment as his residential address in order to obtain insurance for his yacht.

Despite the fact that he was purportedly living in Plaquemines Parish, from June 12-27, 2018, he was residing at and had packages delivered from Amazon to him at The Ritz Carlton Hotel on Canal Street in New Orleans.

The Nick Loeb Louisiana Trust address was listed as1745 Broadway, Floor 18, New York, NY 10019, not a Belle Chasse address.

Mr. Loeb has an umbrella insurance policy (for personal excess, homeowners and collections) through AIG and the mailing address is listed as 505 Park Avenue, 5th Floor, New York, NY 10022 and not a Belle Chasse address.

On a New York Partners Schedule K-1 that Mr. Loeb executed on April 6, 2018, it asked for "resident status" and Mr. Loeb marked the box next to "NYS," which he admits were initials for New York State. This occurred during a time when he claimed to be a resident of Belle Chasse, Louisiana.

Mr. Loeb recalled that he had internet/cable service in his New York apartment, as well as his residence in Florida, but he could not recall if he had such services in either property in Belle Chasse, where he purportedly resided and had an intent to remain.

Mr. Loeb agrees that his Louisiana driver's license was issued on June 11, 2018, and listed the Protti property as his address, even though he admitted that it was incorrect and he was allegedly residing at the apartment on Zeta Drive in Belle Chasse. Moreover, at the time when he was issued a Louisiana driver's license, he simultaneously possessed a valid Florida driver's license; in fact, on May 31, 2018, he paid for a replacement Florida driver's license, that he could not recall if he ever sent back.

Mr. Loeb admitted the veracity of an email exchange dated January 10, 2018, between himself, Sameer Khan, and Kristyn Rivera of Selznick & Company

49

indicating that for his Florida BlueCross BlueShield health insurance his residential address will remain as 3301 North Country Club Drive, Number 105, Aventura, Florida. Further, the principal place of business for his company, Loeb's Onion Crunch, is also 3301 North Country Club Drive as evinced by the Florida Limited Liability Report filed with the Florida Secretary of State on April 11, 2018.

Mr. Loeb admitted that on December 17, 2018, he received an email from Angela Reddoch, indicating that she was going to go to his Zeta Drive apartment and put "the sheets and everything on [the] bed tomorrow…then I'll send pics."

Mr. Loeb acknowledged that the ART contract was signed in California, that he donated sperm in California, that Ms. Vergara donated ova in California, and that after the contract was executed he did nothing with respect to the creation of the embryos in Plaquemines Parish, Louisiana. Despite the aforementioned, when asked why he did not file suit in California, he testified that California does not recognize embryos as persons, and Louisiana does, and the only reason he picked Louisiana to create a residence was to have a basis to file suit, to which he responded, "[a]bsolutely."

*Mr. Brian Boudreaux's Deposition Testimony*

The deposition transcript of Mr. Boudreaux, a retired deputy with the Plaquemines Parish Sheriff's Office ("the Sheriff's Office")[29] and current part-time public relations officer with the Sheriff's Office was admitted into evidence as

---

[29] He testified that he worked there from 1984 until he retired in 2014.

Exhibit 3 in support of Ms. Vergara's exception. Mr. Boudreaux's deposition was taken on April 5, 2019.

Mr. Boudreaux testified that he first met Mr. Loeb in either 2013 or 2014, when Mr. Loeb and Ms. Vergara were still dating. He stated that Mr. Loeb was residing with Ms. Vergara while she was filming a movie, "Hot Pursuit," and indicated that he would be interested in performing reserve work with the Sheriff's Office. Mr. Boudreaux testified that once Mr. Loeb became a reserve officer, he did not come down to Plaquemines Parish and did not perform duties too often— about 4-5 times total during a 5-6 month period only.

Mr. Boudreaux testified that a year prior to his deposition, Mr. Loeb contacted him and told him he was looking for a place to stay in Plaquemines from time to time. Mr. Boudreaux described it as follows: "You know, if he came into town, he was looking for a place where he could, you know, bunk up for the night, wouldn't be in town too often, but if I could find him a house." After receiving this call from Mr. Loeb, Mr. Boudreaux indicated that he knew someone with a house on Protti Drive in Belle Chasse for lease, Ms. Bonnie May. He testified that he told Ms. May that Mr. Loeb would be dropping in from time to time, but would not be in town very often and that he just needed a place to stay if he needed it.

He recalled Mr. Loeb arriving at the house once, early in his leasing period, but never saw him again at the house. He also recalled that when Mr. Loeb moved out of the Protti property and into an apartment on Zeta Place, Mr. Loeb came into town with his girlfriend and daughter and stayed at the Zeta Place apartment for

51

only one week. He admitted that Mr. Loeb sent him an email dated October 24, 2018, indicating that Mr. Loeb intended to use Zeta Place as his U.S. residence.

*Ms. Kristyn Rivera's Deposition Testimony*

The deposition transcript of Ms. Rivera was admitted into evidence as Exhibit 4 in support of Ms. Vergara's exceptions.

Ms. Rivera, a New York Certified Public Accountant and partner at her firm, Selznick and Company, testified that Mr. Loeb hired her firm in March 2017 and their business relationship ended in December 2018 due to fees. Her firm served as his general and tax accounting firm. Her firm paid all of his bills, prepared his tax returns, handled his medical insurance claims, and served as his mailing address to receive mail. In addition, her assistant, Sameer Khan, would also serve as a personal assistant to Mr. Loeb handling miscellaneous items for him, which included: order Amazon.com items, return clothes to on-line retailers; and complete paperwork for Mr. Loeb to obtain utilities at the properties in Louisiana; assist Mr. Loeb to obtain a Louisiana driver's license; renew Mr. Loeb's Florida driver's license; renew Mr. Loeb's Florida medical insurance; etc.

From March 2017 through December 2018 (when her firm's engagement ended), she testified that Mr. Loeb maintained residences in Spain, New York, Florida and Louisiana. She further testified that in 2017 he was a Florida resident; in fact during their entire business relationship, even when Mr. Loeb was actually living in Spain, he maintained a Florida (residency) address to maintain his Florida health insurance with Blue Cross Blue Shield of Florida.

Her firm prepared Louisiana taxes for Mr. Loeb as follows:  in 2015 and 2016 as a non-resident, who was deriving investment income, and in 2017 as a part-year resident. Her justification for making him a part-year resident for Louisiana in 2017 was due to the fact that he signed a lease for Protti Drive in Belle Chasse, Louisiana, on December 14, 2017, and Mr. Loeb told her that he moved there on December 1, 2017.  She indicated that the laws of Louisiana allowed her to make him a part-year resident even though he had executed a lease approximately fifteen (15) days before the end of the year.[30]  She later admitted in her deposition that at the time she claimed that Mr. Loeb lived in/was a resident of Louisiana for income tax purposes, she knew that he lived in Spain and had a new address in Spain.  She further admitted that in October 2017, when Mr. Loeb sent an email to her indicating he may create a residency in Louisiana, that she responded,  "I thought you were moving to Spain for two or three years."

Despite her testimony that he had established a residency in Louisiana as of the date of the execution of his lease agreement—December 14, 2017—she admitted during her testimony that Mr. Loeb's statements from his AMEX card,[31] a card which she stated he used for everything, evinced overseas charges on the following dates:  December 17, 23, 24, 26, 28, 30 and 31, 2017.  She testified that during that period, there were no charges in Louisiana.  She agreed that these dates

---

[30] Pursuant to La. R.S. 47:31(1), "[e]very natural person domiciled in the state, and every other natural person who maintains a permanent place of abode within the state or who spends in the aggregate more than six months of the taxable year within the state, shall be deemed to be a resident of this state for the purpose of determining liability for income taxes under this Chapter."

[31] During her deposition she was presented with Mr. Loeb's AMEX Transaction details report for the time period from November 1, 2016, through March 29, 2019, which had been obtained through Ms. Vergara's requests for production of documents.

coincided with the dates that she used to state that he either had a permanent place of abode or was domiciled in Louisiana, in order to file income taxes in Louisiana for the same period.

Ms. Rivera further testified that for the months of January and February 2018, Mr. Loeb had various charges on his AMEX card, none of which occurred in Louisiana. For instance, she agreed that the AMEX card showed charges on the following dates and places: January 15-16—New York; January 17—Pomona Beach, Florida; January 18—Palm Beach, Florida; February 4—Great Britain; February 5—Dublin, Ireland; February 18—Andorra, Spain; and February 23—California. In summary, Ms. Rivera admitted that from December 16, 2017, through February 23, 2018, there were no charges in the State of Louisiana. Furthermore, Ms. Rivera admitted that the AMEX statements showed that for the entire months of March and April 2018, there were no charges in Louisiana, but did show transactions exclusively in foreign countries.

Ms. Rivera agreed that other than one (1) debit card transaction, and three (3) charges at Sorba's Greek Bistro, Subway and Two Chicks Café, all in Baton Rouge, during the time period from May 1, 2018 through June 30, 2018, there were no other charges that took place in Louisiana. Despite the miniscule charges on his AMEX, which is what she states he uses for everything, in Louisiana during the aforesaid time period, Ms. Rivera asserted during her deposition that she believed Mr. Loeb was living in Louisiana from April to July 2018.

From July 1, 2018, through March 31, 2019, Ms. Rivera agreed that all charges on his AMEX and Automated Teller Machine ("ATM") withdrawals were in Spain, with no charges or ATM withdrawals occurring in Louisiana, or the United States. She admitted that at least from July to September 2018, he was not living in Louisiana, but was living on his yacht that is located in Europe.

Ms. Rivera stated that the first lease payment made for the Protti property occurred on December 15, 2017, and not at any earlier time period. She also testified that from December 15, 2017, through November, 2018, her firm paid monthly rent payments for the Protti property, even though Mr. Loeb was residing out of the country. She also paid rental payments for the Zeta property beginning July 2018, through the end of their business relationship. She testified that to her knowledge, Mr. Loeb never spent one night at the Zeta property. Furthermore, the entire time she paid rent for both Belle Chasse properties, she paid monthly rent to Manvinder Bhathal for the New York apartment. In addition, at Mr. Loeb's direction, on January 29, 2018, her firm "prepared payroll for [a] household employee," Julie, his New York apartment housekeeper.

During her deposition, she stated that her assistant Sameer ensured that utilities were placed into Mr. Loeb's name—this occurred on January 9, 2018, for the Protti property. As it relates to the Zeta property, Attorney McQueen told her to ensure that those utilities were placed into Mr. Loeb's name and that Mr. Boudreaux would take care of everything, if they sent money orders to him for him to accomplish the task, which her office did.

Ms. Rivera reviewed utility bill payments for the Protti and Zeta properties, which were set on automatic payments from May 2018 through February 2019. She allowed Mr. Loeb to utilize her home address for utility services for Louisiana, because he did not have another U.S. address to use in order to get the utilities turned on at the Belle Chasse properties. The utility bills evinced the following amounts due in both summer and winter months in Louisiana:  May 4th--$15.00 (Atmos), May 8th--$10.65 (Entergy), May 30th--$15 (Atmos), June 6th--$9.18 (Entergy) and $16.13 (Atmos), July 9th--$30.21 (Entergy), September 11th--$20.14 (Entergy), October 15-$10.90, November--$9 (Entergy) and $15 (Atmos), December 7th--$33.78 and $9.15, December 14th--$15 (Atmos), December 18th--$9.24, December 26th--$9.24 (Entergy) and February--$12.01 (Entergy).

She testified that Mr. Loeb had a banking relationship with Morgan Stanley. At different periods of time between 2016 through 2018, either 1850 Lake Drive Delray Beach, Florida or her office were used as mailing addresses for his statements.  At no time however, did he ever use Belle Chasse as a mailing address for his statements.  In addition, during their entire business relationship (beginning of 2017 to the end of 2018), his primary bank was Signature Bank, which is located in New York.

During her firm's relationship with Mr. Loeb, at his direction, her office ordered various things using Mr. Loeb's Amazon account and the mailing locations were exclusively:  New York, Florida, Baton Rouge, and at The Ritz Carlton Hotel in New Orleans, but never the Protti or Zeta properties.

Ms. Rivera acknowledged the contents of email communications between Attorney McQueen and Mr. Loeb, to which she was a party that indicated the following directions that Attorney McQueen gave to Mr. Loeb in order to establish a residence in Louisiana: keep track of the times he stayed at the house in Louisiana; join the Chamber of Commerce; open a bank account in Plaquemines Parish; prove that he receives mail in Belle Chasse; and in June 2018 obtain a Louisiana driver's license and voter registration card. In fact, during the deposition, Attorney McQueen interjected and stipulated that she gave said directions to Mr. Loeb. Ms. Rivera stated that her office coordinated for Mr. Loeb to obtain a Louisiana driver's license, even though he was already the holder of a valid Florida driver's license.

On December 27, 2018, at the end of their business relationship, Mr. Loeb indicated to her that he was in Spain. She never had a conversation with him where he claimed that he was calling from his home in Louisiana.

*Ms. Cathy Beckerman's Deposition Testimony*

Ms. Beckerman's deposition transcript was admitted into evidence in support of Ms. Vergara's exceptions. Her deposition occurred on August 30, 2019.

Ms. Beckerman is a writer, producer and director of the impending film, "Roe v. Wade;" she and Mr. Loeb are currently working on the film project together. She met Mr. Loeb through her husband.

Ms. Beckerman testified that she visited Mr. Loeb during the fall of 2017 and in July 2018 at 300 East 4th Street in New York. She also testified that she

knows he has had several residences in Louisiana: Baton Rouge, the Ritz Carlton Hotel and Protti Drive. She stated that he lived in Baton Rouge for a few months in an apartment. She also stated that one time while she had an occasion to be in Plaquemines Parish, she visited him on Protti Drive, even though she did not go inside of the home. She admitted to being sent a package in "care of her" on behalf of Mr. Loeb while she was residing in Baton Rouge, Louisiana in June 2018, despite the fact that she had testified that during that same time period he, too, was living in Baton Rouge.

Ms. Beckerman admitted that she allowed Mr. Loeb, pursuant to his request, to use her father's physical address—3301 North Country Club Drive, No. 105 in Aventura, Florida to serve as Mr. Loeb's residential address for Florida Blue Cross Blue Shield purposes and to receive mail. This was evinced by her statement, along with several emails exchanged between Mr. Loeb, Ms. Rivera and her that occurred on January 7-8, 2018.

Ms. Beckerman did not dispute the contents of an email exchange that occurred on January 9-10, 2018, wherein Mr. Loeb indicated that he was not in the country and could not sign the necessary paperwork to set up banking accounts related to the production of the film, "Roe v. Wade."

On January 29, 2018, Ms. Beckerman acknowledged receiving an email from Mr. Loeb. In that email Mr. Loeb suggested using her address for a

document that he needed to execute because he was flying to Louisiana "tomorrow" and that he did not have a "hotel yet."[32]

She also stated that she visited him in Spain in either September, October or November 2018, as well as June and July of 2019. She stayed on his yacht, which she described as big and had four (4) crewmembers. In preparation for her trips there, Mr. Loeb requested that she purchase some items for him from the United States that he could not obtain in Spain; she complied with the request and brought them to him.

Ms. Beckerman acknowledged receiving an email from Mr. Loeb dated February 17, 2018, wherein he requested reimbursement expenses for the "Roe v. Wade" film, including his trip to Louisiana during the time when he purportedly was residing and domiciled in Louisiana.

She recalled that in February 2019, he visited her in California for a few days, but returned to Spain once he left.

*Affidavit of Bonnie May*

An affidavit of Ms. Bonnie May was executed on April 3, 2019, and it was admitted into evidence as Exhibit 6 to Ms. Vergara's exceptions. She attested that she and her husband, Gary May own a property located at 1100 Protti Drive in Belle Chasse, Louisiana. In October 2017, her son and daughter-in-law moved out of the Protti Drive property. During that same time period, her husband was contacted by Mr. Boudreaux whom her husband has known for many years. Mr.

---

[32] During this same time period, he had already executed a lease for the Protti property.

Boudreaux told her husband that his friend Mr. Loeb wanted to rent the property. She attested that she never met or spoke with Mr. Loeb. Mr. Boudreaux relayed to her that Mr. Loeb and his girlfriend were having a fight over the eggs they created and Mr. Loeb needed a place in Belle Chasse.

Beginning November 2, 2017, Mr. Loeb signed a thirteen (13) month lease for the Protti Drive property. Mr. Boudreaux prepared the lease agreement and she gave him the keys. For any issues related to the property, she always dealt with Mr. Boudreaux, Ms. Angela Reddick or a personal assistant of Mr. Loeb, or his accountants in New York.

After the lease was executed, Ms. May received a phone call from Mr. Loeb's assistant requesting that the utilities be placed in his name. Although she preferred to keep the utilities in her name to ensure that they would be paid, she agreed to the change. During the lease term, the toilet at the property started leaking, resulting in an $800 water bill.[33] Because no one was at the property, Ms. May attests that she had to go to the property to deal with it. While in the property, Ms. May stated that she noticed the only furniture in the house was a bed and it did not have sheets or blankets. Also, during the term of the lease, Mr. Loeb's assistant made a request to install a remote system that would allow Mr. Loeb to remotely control the lights, heating and air conditioning. Ms. May agreed to the request, as long as he used a licensed electrician. At the end of the lease, Mr. Loeb left a table and chairs at the property.

---

[33] Ms. May attested that the leaking toilet occurred twice, first in November 2017, and then again in either February or March 2018.

*Affidavit of Bonnie Buras*

Ms. Buras executed an affidavit on December 10, 2018, and it was admitted into evidence in support of Ms. Vergara's exceptions. She attested that she is a real estate agent and was the leasing agent for the Zeta property. In August 2018, she was contacted by Attorney McQueen who represented to her that she wanted to rent the apartment on behalf of Mr. Loeb. She attested that she never met or spoke with Mr. Loeb and never showed the apartment to Attorney McQueen or Mr. Loeb. She further attested that she gave the apartment keys to Mr. Boudreaux. She attested that she had no information to suggest that Mr. Loeb ever received the keys or that he lived in the apartment. In her twenty-five (25) years as a real estate agent, she never had an attorney contact her to rent an apartment on behalf of his/her client.

*Analysis*

Based on the applicable jurisprudence and in light of the exhibits submitted at the trial on the exceptions, pertinent excerpts of which are referenced hereinabove, we find that the trial court correctly sustained Ms. Vergara's exception of venue.

Irrespective of whether the general rule (La. C.C.P. art. 42) or the exception (La. C.C.P. art. 74.2(A)) applies, Appellants cannot prove that they are domiciled in Louisiana, have a residence in Louisiana, or have the intent to reside in Louisiana.

First, Appellants state in their petition, filed on January 9, 2018, that "Mr. Loeb is currently domiciled in Plaquemines Parish, Louisiana, and has a habitual residence and an intent to remain there…[.]". Based on the deposition testimony, exhibits thereto and affidavits admitted into evidence at the hearing on the exception, this statement is patently false.

During Mr. Loeb's deposition he admitted that for the entire time he rented the Protti property he never resided there one night. The first lease for the Protti property was effective December 14, 2017, through December 2018, and it was later amended to start November 2017. The email exchange between Mr. Loeb and Mr. Boudreaux evinced that the renting of the Protti property was contrived to make it appear as though Mr. Loeb resided there. Further, in the communication that Mr. Boudreaux had with Ms. May, the landlord of the Protti property, he told her that Mr. Loeb needed an occasional place to stay while he was in town—on an intermittent basis only. Ms. May indicated that when she went to the house to deal with a plumbing issue there was no sign of the place being lived in, as the bed had no sheets or blankets on it. Finally, Mr. Loeb's own accountant, Ms. Rivera, indicated that the AMEX and ATM records showed that he had not spent any time in Louisiana from December 2017 through February 2018. Furthermore, when shown more financial records, Ms. Rivera had to admit that other than some minor charges during either May or June 2018, Mr. Loeb's financial transactions did not evince that he was ever present in Louisiana. In fact, from July 1, 2018, through March 31, 2019, Ms. Rivera agreed that *all* charges on his AMEX and ATM

withdrawals occurred in Spain. She further stated that during July and September, 2018, he was living on his yacht in Europe.

Thus, contrary to his statement in his petition for custody, Louisiana was not Mr. Loeb's habitual residence. Further, Mr. Loeb has not indicated an intent to make Louisiana his domicile or habitual residence.

While it is true that Mr. Loeb obtained a Louisiana driver's license, one of the indicia of intent, he did so while maintaining a valid Florida driver's license, a Florida residence for health insurance purposes, New York State residency for financial reasons, a New York City pharmacy, a New York bank, a New York address and Florida address for receiving mail, residences in New York and Spain, and an umbrella insurance policy covering furnishings everywhere, but Louisiana, since he did not maintain any significant furnishings at either of the Louisiana properties that he was renting. Moreover, what is most incredible about his claim of intent to make Louisiana his domicile are his own words that he only wanted to "create" a residence in order to file a lawsuit in Louisiana because Louisiana views embryos as humans, as opposed to California, which views them as property.

Mr. Loeb next alleges in his petition that he "had been an owner of a business, has paid taxes in Louisiana and conducted business in Louisiana for over fifteen years." When asserting this allegation, Mr. Loeb clearly is referencing his relationship with Hernandez Consulting, LLC, which he testified to during his deposition. However, according to the Louisiana Secretary of State's Corporations Database webpage, Hernandez Consulting is a "non-Louisiana" corporation, based

in Miami, Florida.[34] Even if Hernandez Consulting was a Louisiana based corporation, this one, single entity, in which Mr. Loeb is not a named member, is not sufficient to evince intent to reside in Louisiana. In fact, for at least 2015 and 2016, Ms. Rivera had prepared a Louisiana income tax return for Mr. Loeb as a "non-resident" based on income received from the company. Therefore, Mr. Loeb's interest in Hernandez Consulting is irrelevant to the current determination of whether Mr. Loeb has an intent to be a resident of or is domiciled in Louisiana.

Mr. Loeb's next allegation is that he "has been and is a volunteer police with Plaquemines Parish, Louisiana." Based on Mr. Loeb's own testimony, coupled with the testimony given by Mr. Boudreaux this statement is clearly false. According to Mr. Loeb's deposition testimony, even before he executed a lease for the Protti property he no longer had a commission with the Plaquemines Parish Sheriff's Office because he had not volunteered "in a while." Further, Mr. Boudreaux stated that other than a total of 4-5 times over the course of a 5-6 month period of time, Mr. Loeb did not come to Plaquemines to perform any reserve officer duties. Thus, based on his own admission, at the time this statement was placed into the petition, it was false.

For the reasons stated above, we find that Mr. Loeb is not domiciled in, does not maintain a residence in, and does not have the intent to be domiciled or a

---

[34] Courts of appeal "may take judicial notice of governmental websites." *Mendoza v. Mendoza*, 2017-0070, p. 6 (La. App. 4 Cir. 6/6/18), 249 So. 3d 67, 71 (citing *Felix v. Safeway Ins. Co.,* 2015-0701, p. 7 (La. App. 4 Cir. 12/16/15), 183 So. 3d 627, 632 & n. 10). See Louisiana Secretary of State's Corporations Database https://coraweb.sos.la.gov/commercialsearch/CommercialSearchDetails.aspx?CharterID=728729_B206604CE2

resident of any parish in the State of Louisiana. Ms. Vergara has met her burden of proving that her exception of venue was correctly granted by the trial court.

Furthermore, based on all of the facts ascertained through the deposition testimony, exhibits, affidavits and allegations contained in Appellants' petition and first amended complaint, it is clear that Mr. Loeb blatantly engaged in forum shopping[35] when he selected, in concert with a member of the bar, Attorney McQueen,[36] Plaquemines Parish to file the instant lawsuit, with full knowledge that it was the improper venue. Their behavior brings disrepute to and makes a mockery of the Louisiana legal system and the bar and is abhorrent.

Pursuant to La. C.C.P. art. 121, because this action was brought in a court of improper venue, the court may dismiss the action. Therefore, we find that trial court did not abuse its discretion when, pursuant to the exception of improper venue, it dismissed the lawsuit with prejudice.[37]

### *Declinatory Exception of Subject Matter Jurisdiction*

In Appellants' first (1st) assignment of error they aver that the trial court erred when it sustained Ms. Vergara's declinatory exception of subject matter jurisdiction. In particular, Appellants argue that under the UCCJEA, in conjunction

---

[35] "The problem of forum shopping dates back to law's earliest days. Criteria are needed to prevent…a party from forcing an adversary to an improper venue." *Lamb v. Highlines Const. Co., Inc.,* 541 So. 2d 269, 270 (La. 4th Cir. 1989).

[36] Attorney McQueen is a member of the State Bar of Missouri who was admitted *Pro Hac Vice* to this jurisdiction for this matter.

[37] See *Garcia v. Bureau Veritas Quality Intern. (North America) Inc.,* 1999-3092, p. 4 (La. App. 4 Cir. 10/4/00), 774 So. 2d 999, 1001, wherein this Court allowed a suit to be dismissed with prejudice when plaintiffs, like in the present case, have "no connexity with the state of Louisiana to justify the exercising of venue…."

with the Louisiana Human Embryo Statutes, the trial court has subject matter jurisdiction to preside over the current litigation. Conversely, Ms. Vergara asserts that the trial court correctly found that it did not have subject matter jurisdiction over the instant cause of action. For the reasons that follow, we agree with Ms. Vergara and find that the trial court did not have subject matter jurisdiction over the instant matter.

This Court, in *Burds v. Skidmore*, explained that "[j]jurisdiction is a question of law and therefore is subject to *de novo* review. When reviewing questions of law, appellate courts afford 'no special weight to the findings of the district court, but exercises its constitutional duty to review questions of law and renders judgment on the record.' Accordingly, 'appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect.'" 2019-0263, p. 3 (La. App. 4 Cir. 3/22/19), 267 So. 3d 192, 194, *writ denied*, 2019-0631 (La. 5/28/19), 273 So. 3d 312 (internal citations omitted).

Because Mr. Loeb seeks custody of embryos pursuant to the UCCJEA and the Louisiana Human Embryo Statutes, we examine the issue of jurisdiction in the context of both of these statutes. At the onset, our research does not reveal any cases in Louisiana interpreting whether the provisions of the UCCJEA, in conjunction with the Louisiana Human Embryo Statues, are applicable to embryos.

This is a *res nova*[38] issue for the courts in Louisiana. Therefore, we must first examine the language of the statutes for guidance on this issue.

In *Baxter v. Baxter*, this Court explained that

> The UCCJEA, which is codified in La. R.S. 13:1801-1842, provides "the exclusive jurisdictional basis in state law for making a child custody determination by a Louisiana court." 1 LA. CIV. L. TREATISE, CIVIL PROCEDURE § 2:5 (2d ed.2014). The UCCJEA serves two purposes: (i) avoiding jurisdictional competition among the states; and (ii) promoting resolution of custody disputes by the forum deemed most likely to have the maximum amount of relevant information regarding the case. *Wootton v. Wootton,* 49,001, p. 5 (La. App. 2 Cir. 5/14/14), 138 So. 3d 1253, 1256. Under the UCCJEA, one of the five scenarios under which a Louisiana court has subject matter jurisdiction to make an initial child custody determination is when the child's home state is Louisiana. *Id.*

2015-0085, p. 12 (La. App. 4 Cir. 6/24/15), 171 So. 3d 1159, 1167.

The jurisdiction of a Louisiana court to make the initial determination of child custody is set out in La. R.S. 13:1813.[39] However, La. R.S. 13:1802 sets forth

---

[38] *Res nova* is "[a]n undecided question of law…a case of first impression." *See Thibodeaux v. Donnell*, 2016-0570, p. 8 (La. 1/20/17), 219 So. 3d 274, 279 fn. 4. (quoting *Black's Law Dictionary* (10th ed. 2014).

[39] In consideration of these definitions, La. R.S. 13:1813 provides the "grounds, in ***preferential order***, that warrant an exercise of jurisdiction" to render the initial custody as follows:

> A. Except as otherwise provided in R.S. 13:1816, a court of this state has jurisdiction to make an initial child custody determination only if:

> (1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state, or had been the child's home state within twelve months before commencement of the proceeding and the child is absent from the state because he was required to leave or was evacuated due to an emergency or disaster declared under the provisions of R.S. 29:721 et seq., or declared by federal authority, and for an

definitions; three (3) of which are pertinent to our analysis of jurisdiction pursuant to the UCCJEA. The term "child" is defined in La. R.S. 13:1802(2) as "an individual who has not attained eighteen [18] years of age." The term "person" is defined in La. R.S. 13:1802(12) as "an individual, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government, governmental subdivision, agency, or instrumentality, public corporation, or any other legal or commercial entity." The term "home state" is defined in La. R.S. 13:1802(7)(a), in pertinent part, as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive

> unforeseen reason resulting from the effects of such emergency or disaster was unable to return to this state for an extended period of time.
>
> (2) A court of another state does not have jurisdiction or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under R.S. 13:1819 or 1820; and
>> (a) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence.
>> (b) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships.
>
> (3) All courts having jurisdiction have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under R.S. 13:1819 or 1820; or
>
> (4) No court of any other state would have jurisdiction under the criteria specified in Paragraph (1), (2), or (3) of this Subsection.
>
> B. Subsection A of this Section is the exclusive jurisdictional basis for making a child custody determination by a court of this state.
>
> C. Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination. (emphasis added).

*State ex rel. A.U.M.*, 46,082, p. 4 (La. App. 2 Cir. 2/16/11), 62 So. 3d 185, 188.

68

months immediately before the commencement of a child custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned." The UCCJEA provides no definitions for either embryos or unborn children. Notwithstanding this fact, approximately twenty (20) years before the enactment of the UCCJEA, in 1986, Louisiana enacted the Human Embryo Statutes, providing legal status, rights and governing rules for IVF human ovum.

Pursuant to La. R.S. 9:123, "[a]n [IVF] human ovum exists as a juridical person until such time as the [IVF] ovum is implanted in the womb; or at any other time when rights attach to an unborn child in accordance with law." Under Louisiana law, "there are two kinds of persons: natural persons and juridical persons. A natural person is a human being. A juridical person is an entity to which the law attributes personality, such as a corporation or partnership. The personality of a juridical person is distinct from that of its members." La. C.C. art. 24.[40] Louisiana Revised Statute 9:126, entitled, "Ownership," states, in pertinent part, "An [IVF] ovum is a biological human being which is not the property of the physician which acts as an agent of fertilization, or the facility which employs him or the donors of the sperm and ovum. If the [IVF] patients express their identity, then their rights as parents as provided under Louisiana Civil Code will be preserved…. A court in the parish where the [IVF] ovum is located may appoint a

---

[40] The revision comment (b) to this article states the following: "According to Romanist tradition, persons are divided into natural persons and juridical persons. A natural person is a human being. *Only human beings may be natural persons.* A juridical person is an entity to which the law attributes personality, such as a corporation or partnership."

curator, upon motion of the [IVF] patients, their heirs, or physicians who caused the [IVF] to be performed, to protect the [IVF] human ovum's rights."

Thus, while on one hand the Human Embryo Statutes clearly state that the IVF ovum is a "juridical person," on the other hand they conflict and recognize the ovum as a "biological human being." Because we are being asked to determine whether the embryos are "children" under the UCCJEA and the Human Embryo Statutes, which by their own words appear in conflict with each other and the latter have internal conflicts, we must examine the legislative intent of each to understand how to apply them to the current matter. The Louisiana Supreme Court, in *Pierce Foundations, Inc. v. Jaroy Const., Inc.,* explained the following:

> Legislation is the solemn expression of the legislative will; thus, the interpretation of legislation is primarily the search for the legislative intent. *Cat's Meow, Inc. v. City of New Orleans,* [19]98-0601, p. 15 (La. 10/20/98), 720 So. 2d 1186, 1198; *La. Safety Ass'n of Timbermen Self-Insurers Fund v. La. Ins. Guar. Ass'n,* [20]09-0023, p. 8 (La. 6/26/09), 17 So. 3d 350, 3-56. *See also* La. R.S. 24:177(B)(1). When a law is clear and unambiguous, and its application does not lead to absurd consequences, it shall be applied as written, with no further interpretation made in search of the legislative intent. La. R.S. 1:4. The starting point for interpretation of any statute is the language of the statute itself. *See, e.g., Cat's Meow,* [19]98-0601, p. 15, 720 So. 2d at 1198; *Timbermen,* [20]09-0023, p. 8, 17 So. 3d at 356.
>
> Additionally, "all laws pertaining to the same subject matter must be interpreted in *pari materia*, or in reference to each other." *See, e.g., State v. Williams,* [20]10-1514 (La. 3/15/11), 60 So. 3d 1189, 1191; La. C.C. art. 13.
>
> When, on the other hand, a statute is not clear and unambiguous, or its application leads to absurd consequences, we rely on secondary rules of statutory interpretation to discern the meaning of the statute at

issue. *See Red Stick Studio Dev., L.L.C. v. State ex rel. Dep't of Econ. Dev.,* [20]10-0193, p. 10 (La. 1/19/11), 56 So. 3d 181, 187-88 (quotation omitted). In such cases, the statute "must be interpreted as having the meaning that best conforms to the purpose of the law. Moreover, when the words of a law are ambiguous, their meaning must be sought by examining the context in which they occur and the text of the law as a whole." *Id.*

2015-0785, pp. 6-7 (La. 05/03/16), 190 So. 3d 298, 303.

The Louisiana Supreme Court, in *Luv N'Care, Ltd. v. Jackel International Limited,* further explained:

The text of a law is the best evidence of legislative intent." La. R.S. 24:177(B)(1). It is only when the meaning of a law cannot be ascertained by the application of the provisions of Chapter 2 of the Preliminary Title of the Louisiana Civil Code (La. C.C. arts. 9-13) and Chapter 1 of Title 1 of the Louisiana Revised Statutes of 1950 (La. R.S. 1:1-1:17), that the courts will consider the intent of the legislature. La. R.S. 24:177(A).

In examining a law, language, words, and phrases are to be read in their context and to be accorded their generally prevailing meaning. *City of New Orleans*, 05-2548 at p. 20, 986 So.2d at 17, citing La. C.C. art. 11; La. R.S. 1:3. It is presumed that every word, sentence, or provision was intended to serve some useful purpose, that some effect is to be given to each such provision, and that no unnecessary words or provisions were employed. *City of New Orleans*, 05-2548 at p. 20, 986 So.2d at 17, citing *Moss*, 05-1963 at p. 15, 925 So.2d at 1196; *Sultana Corporation*, 03-0360 at p. 9, 860 So.2d at 1119. As a result, courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless and surplusage if a construction giving force to, and preserving, all words can legitimately be found. *City of New Orleans*, 05-2548 at p. 20, 986 So.2d at 17, citing *Moss,* 05-1963 at 15, 925 So.2d at 1196; *St. Martin Parish Police Jury v. Iberville Parish Police Jury*, 212 La. 886, 899-900, 33 So.2d 671, 676 (1947).

Furthermore, a statute should be construed in such way as to reconcile, if possible, apparent inconsistencies so that each part is given effect. *State v. Cazes*, 262 La. 202,

> 215-16, 263 So.2d 8, 12 (1972). Since the meaning is to be determined from a general consideration of the act as a whole, all parts, provisions, or sections must be read together; each must be considered with respect to, or in the light of, all the other provisions, and construed in harmony with the whole. *Id.* The intent as deduced from the whole will prevail over that of a particular part considered separately. *Id.* Meaning should be given, if possible, to each and every section, and the construction placed on one portion should not be such as to obliterate another; so, in determining the meaning of a word, phrase, or clause, the entire statute is to be considered. *Id. See also Israel v. City of New Orleans*, 130 La. 980, 985, 58 So. 850, 852 (1912) ("The meaning of a word or phrase may be ascertained by the meaning of other words or phrases with which it is associated.").

2019-0749, pp. 4-5 (La. 1/29/20), ---So. 3d---, 2020 WL 499164 *8-9.

Because we find that the language in one part of the Human Embryo Statutes is in conflict with other parts of the statutes and the definition of a child contained in the UCCJEA is not contained in the Human Embryo Statutes, and it cannot be reconciled by a reading of the statutes, based on the Louisiana Supreme Court's guidance, we must understand the legislative intent behind both.

On June 18, 1986, (then) Louisiana State Senator Thomas A. Casey, Chairman of the Judiciary A Committee, introduced Senate Bill 701 Acts 1986, No. 964, § 1, the Human Embryo Statutes, which are codified at La. R.S. 9:12-133. During the Senate Judiciary A Committee Meeting, Mr. John Krentel explained the following:

> [T]he bill attempts to meet the needs of couples who wish to take advantage of fertilization clinic services, and encourage the use of those services and provide legal recognition for the [IVF] ovum under a conceptual frame-work of a juridical person. Under Louisiana law there are two types of persons—natural persons and juridical persons. This bill would create a third group of juridical person[s], the [IVF] ovum. Once

the ovum is implanted in the womb, it would then cease to be a juridical person.[41]

The Louisiana Senate Conference Committee Report Digest regarding Senate Bill 701 of the 1986 Regular Session stated that its passage accomplished the following:

> New law defines a human embryo as an in vitro fertilized ovum with certain rights and further provides for its recognition as a juridical person; provides for the use and identification of the in vitro fertilized human ovum; provides that an in vitro fertilized human ovum is a biological human being which is not the property of the physician who acts as the agent for fertilization, or the facility which employs him, or the donors of the sperm and ovum; provides that only medical facilities meeting the standards of the American Fertility Society and the American College of Obstetricians and Gynecologists which are directed by a medical doctor licensed in this state, who also meets such standards, shall cause the fertilization of a human ovum; and provides that, in a dispute arising between parties regarding the in vitro fertilized ovum, the dispute shall be resolved in the best interest of the in vitro fertilized ovum.

> New law further provides that a viable in vitro fertilized human ovum shall not be intentionally destroyed; an in vitro fertilized human ovum may be made available for adoptive implantation if the in vitro fertilization patients renounce their parental rights for in utero implantation; strict liability or liability of any kind, including actions relating to succession rights and inheritance, shall not be applicable to any physician, hospital, in vitro fertilization clinic, or its agent in preparing the in vitro fertilized human ovum for transfer to the human uterus; any immunity granted by the new law is applicable only to an action brought on behalf of the in vitro fertilized ovum; and inheritance rights do not flow to the in vitro fertilized ovum as a juridical person, unless the in vitro fertilized ovum develops into an unborn child that is born in a live birth.

On May 4, 2006, (then) Louisiana State Representative Cheryl Gray introduced House Bill 60 (Act 822) the UCCJEA, which took the place of the

---

[41] Louisiana Senate Judiciary A Committee Minutes, May 13, 1986.

former Uniform Child Custody Jurisdiction Law ("UCCJL").[42]  On the Louisiana

House of Representatives' floor, Rep. Gray stated that the UCCJEA was created

because it "would put Louisiana in the same position as 44 other states who [sic]

have enacted this Act.  It updates our statute which we put into place in 1968."[43]

The Louisiana House of Representative Conference Committee Report

Digest regarding House Bill 60 of the 2006 Regular Session stated that its passage

accomplished the following:

> (1) It revises the law on child custody jurisdiction in light of federal enactments and almost 30 years of inconsistent case law.  It provides clearer standards for which states can exercise original jurisdiction over a child custody determination and gives home state jurisdiction priority over other jurisdictional bases.  It also provides a standard of continuing jurisdiction and clarifies modification jurisdiction.
>
> (2) It provides a uniform remedial process to enforce interstate child custody and visitation determinations by setting forth a simple procedure for registering a custody determination in another state…. It further provides methods for courts to cooperate with each other and request assistance from courts of other states.

Our review of the aims and goals of the Human Embryo Statutes and the

UCCJEA still leaves us in a position of ambiguity.[44]  While the Human Embryo

Statutes clearly carve out the embryos as human, they stop short of referring to the

---

[42] The UCCJL, which was enacted by 1978 La. Acts, No. 513, § 1 and codified at La. R.S. 13:100-1724, was repealed by Acts 2006, No. 822, §2, eff. Aug. 15, 2007.

[43] A video recording of the May 4, 2006 House Vote is available at https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2006/may/0504_06_Day2 2_2006RS the testimony begins at 2:09:07.

[44] "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature."  La. C.C. art. 9.

embryos as "children" as contemplated by the UCCJEA. In fact, the human embryos are classified as a third class of juridical persons as envisioned by Mr. Krentel, the author behind the statutes; but there is no clear definition as what this "third juridical person" category explicitly means. However, what is clear, is that it does not mean that a human embryo (not in utero) is a child. Moreover, the only time that the word "child" appears in the statutes is in reference to inheritance rights, i.e., "the unborn child;" and in this instance it is only after the embryo has been implanted into the womb of a woman are the words "unborn child" even used in the Statutes, which is the not the case presently. While the Human Embryo Statutes reference "best interest" and "parental rights," taken in silo without the word "child" or "children" we find that they have no consequential bearing on the issue faced by this Court presently.

Furthermore, the Human Embryo Statues were enacted by the Louisiana legislature in 1986 and made no reference to the UCCJEA's predecessor, the Uniform Child Custody Jurisdiction Law, which was enacted in 1978 and repealed and replaced in 2006 with the UCCJEA. Likewise, the UCCJEA makes no reference to and no exception for the provisions of the Human Embryo Statutes despite the fact that they were clearly in effect at the time of the UCCJEA's enactment. In fact, on the Louisiana House Floor, Rep. Gray indicated that the UCCJEA was being enacted in order to have Louisiana be put into the *same* position as forty-four (44) other states. Thus, we look to, as persuasive guidance, decisions from other jurisdictions that have considered whether the UCCJEA

applies to embryos and/or unborn children because from the plain words of the legislature, that is what the legislature desired, i.e., for Louisiana to be in the same position as other states.

In *People In Interest of G.C.M.M.*, the court reasoned that "[w]hen interpreting these provisions, we look to guidance provided by other states because, if a statute has been adopted from a uniform law, it should be construed to bring uniformity to the law in the various states that adopt it." No. 2020 COA 152, 2020 WL 6597316, at *5 (Colo. App. Oct. 29, 2020) (internal citations omitted). In *Gray v. Gray*, the court reasoned that based on the UCCJEA's definitions of "child" and "home state," "we are convinced that the UCCJEA does not provide a basis for jurisdiction over a child-custody proceeding involving an unborn child" because "an unborn child cannot have a home state." 139 So. 3d 802, 806 (Ala. Civ. App. 2013). The court in *Arnold v. Price* reasoned that "the UCCJEA does not apply to unborn children." 365 S.W.3d 455, 461 (Tex. App.2011). Further, the *Arnold* court relied on *Waltenburg v. Waltenburg* in which that court reasoned that:

> [R]eading the UCCJEA to authorize jurisdiction over a custody matter concerning an unborn child would defeat the clear purpose underlying the legislature's enactment of the UCCJEA—to prioritize home-state jurisdiction. Under such a reading, a party could file suit pre-birth under the UCCJEA provision authorizing jurisdiction when 'no other court has jurisdiction,' and use the 'simultaneous proceeding' provision to control, post-birth, whether the child's home state can ever exercise that 'priority' jurisdiction. We reject this reading of the UCCJEA.

270 S.W.3d 308, 318 (Tex. App.2008).

In *Fleckles v. Diamond*, the father of an unborn child sought to establish paternity, joint custody, and visitation prior to the unborn child's birth pursuant to the UCCJEA. 35 N.E.3d 176 (Ill. App. Ct.2015). In consideration of the UCCJEA's definitions of child and home state, the court found that the UCCJEA did not apply to unborn children. *Id.* at 188. The Court in *Arkansas Dep't of Human Servs. v. Cox* reasoned that "[a] 'child' for purposes of the UCCJEA 'means an individual who has not attained eighteen (18) years of age.' This means that the UCCJEA does not apply to unborn infants."349 Ark. 205, 214; 82 S.W.3d 806, 812-13 (2002) (internal citations omitted).

We are clear that we are not the legislative branch, and that "[c]ourts are not free to rewrite laws to effect a purpose that is not otherwise expressed." *Luv N'Care, Ltd.*, 2019-0749, p. 5, 2020 WL 499164, *10 (citing *Kelly v. State Farm Fire & Casualty Company*, 2014-1921, p. 20 (La. 5/5/15), 169 So. 3d 328, 240; *Cacamo v. Liberty Mutual Fire Insurance Company,* 1999-3479, p. 4 (La. 6/30/00), 764 So. 2d 41, 44; *White v. Wal-Mart Stores, Inc.,* 1997-0393, p. 4 (La. 9/9/97), 699 So. 2d 1081, 1084).

Thus, based on the above, and especially in light of the legislature's silence with regard to treating embryos, that are not implanted into a woman's womb, like children in the Human Embryo Statutes, we find that the UCCJEA does not apply to embryos or unborn children. As such, the UCCJEA is inapplicable in the instant matter and the trial court did not commit legal error in sustaining the exception of

lack of subject matter jurisdiction and ultimately dismissing the current action, with prejudice. Thus, we find that this assignment is without merit.

### *Declinatory Exception of Personal Jurisdiction*

We next address Appellants' assignment of error that the trial court erred in determining that it lacked personal jurisdiction over the parties.

Because we have already found that Appellants cannot maintain their petition for custody in Louisiana because Mr. Loeb is not a resident of or domiciled in Louisiana, we must determine whether Louisiana has personal jurisdiction over Ms. Vergara as with any other proceeding.

A *de novo* standard of review applies to an appellate court's review of a trial court's finding of personal jurisdiction. *Graham v. Crawford,* 2015-1034, p. 9 (La. App. 4 Cir. 9/29/15), 176 So. 3d 1148, 1154 (citing *New Inv. Properties, LLC v. ABC Ins. Co.,* [20]07-0943, p. 3 (La. App. 4 Cir. 11/21/07), 972 So. 2d 392, 395). Accordingly, we must determine whether Louisiana has personal jurisdiction over Ms. Vergara without deference to the trial court's findings. However, because the trial court did not conduct a contradictory hearing on the exception, but allowed the parties to "submit" the exceptions, along with supporting evidence, i.e., exhibits, we are guided by the Louisiana Supreme Court in making our determination as follows:

> The trial court did not conduct a contradictory evidentiary hearing on the exception to jurisdiction. The record was comprised of pleadings, memoranda, and discovery depositions taken in this matter. If there had been a contradictory evidentiary hearing, plaintiff would have had to prove facts in support of her showing that jurisdiction was proper by a preponderance of the

> evidence. However, under constitutional and codal principles, when the trial court decides the jurisdictional issue without a contradictory evidentiary hearing, as it has done in the present case, the burden of the non-moving party is relatively slight and allegations of the complaint and all reasonable inferences from the record are to be drawn in favor of the non-moving party. La. C.C.P. art. 925, 930. See also *American Greetings Corp. v. Cohn,* 839 F.2d 1164 (6th Cir.1988); *Poston v. American President Lines, Ltd.,* 452 F.Supp. 568 (S.D.Fla.1978).

*de Reyes v. Marine Mgmt. & Consulting, Ltd.*, 586 So. 2d 103, 109 (La. 1991)

Accordingly, our first step in determining whether Ms. Vergara is subject to personal jurisdiction in Louisiana is to draw all reasonable inferences in favor of Appellants by looking at the bare allegations contained in their First Amended Complaint. Paragraph seven (7) clearly states that Ms. Vergara is "a resident of the State of California."[45] Based on this allegation, which Ms. Vergara contends is true, we next turn our analysis to Louisiana's long-arm statute, which is codified at La. R.S. 13:3201 and provides:

> A. A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident:
> (1) Transacting any business in this state.
> (2) Contracting to supply services or things in this state.
> (3) Causing injury or damage by an offense or quasi offense committed through an act or omission in this state.
> (4) Causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in this state.

---

[45] Additionally, in Mr. Loeb's deposition, he admitted that Ms. Vergara lives in California.

79

(5) Having an interest in, using or possessing a real right on immovable property in this state.

(6) Non-support of a child, parent, or spouse or a former spouse domiciled in this state to whom an obligation of support is owed and with whom the nonresident formerly resided in this state.

(7) Parentage and support of a child who was conceived by the nonresident while he resided in or was in this state.

(8) Manufacturing of a product or component thereof which caused damage or injury in this state, if at the time of placing the product into the stream of commerce, the manufacturer could have foreseen, realized, expected, or anticipated that the product may eventually be found in this state by reason of its nature and the manufacturer's marketing practices.

B. In addition to the provisions of Subsection A, a court of this state may exercise personal jurisdiction over a nonresident on any basis consistent with the constitution of this state and of the Constitution of the United States.

"By the legislative enactment of La. R.S. 13:3201(B), the limits of the Louisiana long-arm statute have become co-extensive with the limits of constitutional due process." *A & L Energy, Inc. v. Pegasus Group,* 2000-3255, p. 4 (La. 6/29/01), 791 So. 2d 1266, 1270 (citing *Petroleum Helicopters, Inc. v. Avco Corp.,* 513 So.2d 1188, 1192 (La. 1987)). "Thus the sole inquiry into jurisdiction over a nonresident is a one-step analysis of the constitutional due process requirements." *Id.* (citing *Superior Supply Company v. Associated Pipe and Supply Company,* 515 So. 2d 790 (La. 1987)).

Based upon the facts and circumstances of the present case and for the foregoing reasons we do not find that Louisiana has personal jurisdiction over Ms. Vergara pursuant to either general or specific jurisdiction as contemplated by the long-arm statute.

Pursuant to the seminal personal jurisdiction case, *International Shoe Co. v. Washington,* the United States Supreme Court explained that a state court may exercise personal jurisdiction over an out-of-state defendant who has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). "Elaborating on [the principles of *International Shoe,* the Supreme Court] distinguished between specific or case-linked and general or all-purpose jurisdiction." *BNSF Railway Co. v. Tyrrell,* 137 S.Ct. 1549, 1557, 19 L.Ed.2d. 36 (2017) (citing *Daimler AG v. Bauman,* 134 S.Ct. 746, 754 (2014) (internal citations omitted)).

*General Jurisdiction*

In accordance with prevailing jurisprudence, general jurisdiction can be exercised over an individual when "[her] affiliation with the State [is] so 'continuous and systematic' as to render [her] essentially at home in the forum State." *BNSF Railway Co.,* 137 S.Ct. at 1558. "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile…." *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U.S. 915, 924, 131 S.Ct. 2846, 2853, 180 L.Ed.2d 796 (2011).

In applying the above-mentioned principles to the instant matter, we find that Louisiana cannot exercise general jurisdiction over Ms. Vergara. As previously stated, Ms. Vergara is a resident of and domiciled in California, a fact that is undisputed by both Appellants and Ms. Vergara. Further, the record does

not reveal that Ms. Vergara has engaged in any continuous or systematic contact with Louisiana so as to make this her "home" state.  In fact, the salient facts regarding Ms. Vergara's presence in Louisiana are as follows: (1) a declaration executed by Ms. Vergara indicating that she was in Louisiana at a hotel from April 8-15, 2013, renting an apartment for two months while filming a movie in Louisiana from May 1, 2014, until July 4, 2014, and two-three other occasions to make appearances for work, and (2) the deposition testimony of Mr. Boudreaux wherein he indicated that he first met Mr. Loeb in either 2013 or 2014, while Ms. Vergara was filming the movie "Hot Pursuit" in Louisiana.  Moreover, in her attestation, Ms. Vergara states that she does not own any property in Louisiana and does not regularly work or conduct any business with the State of Louisiana.

None of the above facts have been disputed by Appellants with any evidence—testimony, documentary or otherwise.  Therefore, based on the negligible contacts with Louisiana, which occurred between almost six-seven years ago, we find that Louisiana cannot exercise general personal jurisdiction over Ms. Vergara in accordance with United States and Louisiana Supreme Court jurisprudential and statutory authorities.

We next focus on whether Ms. Vergara is subject to personal jurisdiction in Louisiana, via specific jurisdiction.

*Specific Jurisdiction*

"Specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear*

*Dunlop Tires,* 564 U.S. at 919. "In order for a court to exercise specific jurisdiction over a claim there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." *Bristol-Meyers Squibb Co. v. Superior Court of California, San Francisco Cty.,* 137 S.Ct. 1773, 1780, 198 L.Ed.2d 395 (2017) (citing *Goodyear,* 564 U.S. at 919, 131 S.Ct. 2846). "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Id.*

It is clear that the connection between the claims against Ms. Vergara and the State of Louisiana is weak. As discussed *infra,* Appellants are not domiciled in or residents of the State of Louisiana and the basis of their cause of action is the IVF procedure, which resulted in the creation of two embryos. It is undisputed that the IVF procedure was conducted in California. Further, in his deposition, Mr. Loeb affirmatively agreed to the following: his sperm was donated in California; Ms. Vergara's ova was donated in California; the embryos were created in California; Ms. Vergara, along with Mr. Loeb executed a contract with ART (a California company) in California, which is responsible for storing and preserving the embryos; and the embryos have always been located in California. Thus, since all of the conduct giving rise to the nonresidents' (Appellants) claims against the nonresident-Appellee/Defendant (Ms. Vergara) occurred in California it logically

83

follows that no court in Louisiana can claim specific jurisdiction over Ms. Vergara.[46]

We find that the trial court did not commit error when it granted Ms. Vergara's declinatory exception of personal jurisdiction and dismissed Appellants' action with prejudice.[47] Thus, we find that Appellants' second assignment of error is without merit.

***Peremptory Exception of Nonjoinder***

Appellants claim that the trial court committed erred when it sustained Ms. Vergara's peremptory exception of nonjoinder as it pertains to ART.

"On appeal from the grant or denial of a peremptory exception based on the non-joinder of a party needed for just adjudication, the appellate court 'review[s] findings of the trial court in accordance with the 'abuse of discretion' standard of review." *Foster v. City of Leesville,* 2017-1106 p. 6 (La. App. 3d Cir. 6/13/18), 250 So. 3d 302, 307 (quoting *Rayford v. Nat'l R.R. Passenger Corp.,* 2005-1273, p. 7 (La. App. 4 Cir. 4/13/07), 962 So. 2d 5, 9).

Louisiana Code of Civil Procedure article 641 entitled, "Joinder of parties needed for just adjudication" provides the following:

A person shall be joined as a party in the action when either:

---

[46] Because we find no connection between the conduct that gave rise to the lawsuit and Louisiana, we do not need to analyze the fact that Ms. Vergara has never purposefully availed herself or maintains minimum contacts with the State of Louisiana.

[47] See *Chevalier v. Charles,* 2020-0223, p. 1 (La. 4/27/20), 295 So. 3d 396 (Mem.) where the Louisiana Supreme Court dismissed a lawsuit with prejudice based on an exception of personal jurisdiction, after finding "no basis for Louisiana to exercise either general or specific personal jurisdiction over relator."

(1) In his absence complete relief cannot be accorded among those already parties.

(2) He claims an interest relating to the subject matter of the action and is so situated that the adjudication of the action in his absence may either:

(a) As a practical matter, impair or impede his ability to protect that interest.

(b) Leave any of the persons already parties subject to a substantial risk of incurring multiple or inconsistent obligations.

"The provisions on joinder of parties were amended to their present form by La. Acts 1995, No. 662, effective 15 August 1995. The amendment removed the terms 'necessary and indispensable parties' and inserted the concept of 'joinder of parties needed for just adjudication.'" *Two Canal Street Inv's, Inc. v. New Orleans Bldg. Corp.*, 2016-0825 (La. App. 4 Cir. 09/23/16), 202 So. 3d 1003, 1011 (citing *Fewell v. City of Monroe*, 43,281, p. 4 (La. App. 2 Cir. 6/11/08), 987 So. 2d 323, 325 (citations omitted)). "A person should be deemed to be needed for just adjudication only when absolutely necessary to protect substantial rights." *Id.* at 1012 (citations omitted). "Courts are to determine whether a party should be joined and whether the action should proceed if a party cannot be joined by a factual analysis of all the interests involved." *Id.* (citing *Gibbs v. Magnolia Living Ctr., Inc.,* 38,184, p. 8 (La. App 2 Cir. 4/7/04), 870 So. 2d 1111, 1116 (citation omitted)). "Under the revision, '[a]n analysis of the interests of the joined and nonjoined parties with respect to the action is required to determine whether the action may proceed.'" *Id.* (citing *Lowe's Home Const., LLC v. Lips,* 10-762, p. 6 (La. App. 5 Cir. 1/25/11), 61 So. 3d 12, 16 (citation omitted)).

In applying the above-referenced statutory and jurisprudential authorities to the instant matter, we find that ART has an interest in the subject matter of this litigation such that adjudication in its absence may impair or impede its ability to protect that interest. In applying La. C.C.P. art. 641, we must read La. R.S. 9:127, in *pari materia,* which provides explicitly that ART, the facility that caused the IVF of the two embryos in this matter, to be directly responsible for their safekeeping. Therefore, ART has an interest in the subject matter of the instant litigation such that its absence may impair and/or impede its ability to protect its interest regarding the mandates of La. R.S. 9:127 as it relates to the status and/or future of the two embryos. Thus, we find that the trial court correctly sustained the exception of nonjoinder. Our inquiry, however, does not end there.

Louisiana Code of Civil Procedure article 642 entitled, "Determination by court whenever joinder not feasible," provides the following:

> If a person described in Article 641 cannot be made a party, the court shall determine whether the action could proceed among the parties before it, or should be dismissed. The factors to be considered by the court include:
>
> (1) To what extent a judgment rendered in the person's absence might be prejudicial to him or those already present.
> (2) The extent to which the prejudice can be lessened or avoided by protective provisions in the judgment, by the shaping of relief, or by other measures.
> (3) Whether a judgment rendered in the person's absence will be adequate.
> (4) Whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

In applying the above factors to the instant cause of action, we find that ART cannot be made a party to the current proceedings, because the trial court does not have jurisdiction over ART, a California corporation. ART does not have an affiliation with Louisiana that is 'continuous and systematic.' *BNSF Railway Co.,* 137 S.Ct. at 1558. Furthermore, it is undisputed that the IVF procedure was conducted in California. Mr. Loeb donated his sperm at ART in California; Ms. Vergara's ova was donated at ART in California; the embryos were created at ART in California; Ms. Vergara, along with Mr. Loeb executed a contract with ART in California; the embryos have always been located and remain at ART in California; and the ART contract specifically provides the following: "This Directive is made and entered into in the State of California and shall be interpreted under the law of the State of California…." Thus, based on the former, ART cannot be made a party to the current litigation.

Next, we need to determine whether the current action should proceed without ART or whether it should be dismissed in light of the statutory factors. There is already pending in a California court, a lawsuit in which Plaintiff-Appellant, Mr. Loeb, is a party, along with ART. Thus, we find that Mr. Loeb will have an adequate remedy in California to assert whatever defenses or rights he may have in that lawsuit pertaining to the embryos while the nonjoined party, ART, can be present to assert whatever rights it may have. Moreover, because the embryos are housed at ART in California and ART is directly responsible for the maintenance and care of the embryos, it would be prejudicial to both ART and Ms.

Vergara to proceed in the instant litigation without ART being represented to assert its rights and/or defenses over the embryos that are in its custody, care and control.

Thus, we find Appellants' sixth assignment of error to be without merit. However, the action should have been dismissed "without prejudice" as opposed to "with prejudice." Insofar as the trial court dismissed the lawsuit pursuant to this exception with prejudice, we amend the judgment to delete the "with prejudice" language and render judgment dismissing the lawsuit without prejudice.[48]

### Motion to Compel Discovery

The final assignment of error we address is Appellants' assertion that the trial court erred when it denied their motion to compel discovery.

On November 1, 2018, Appellants propounded discovery upon Ms. Vergara that included twelve (12) requests for admissions, six (6) interrogatories and nine (9) requests for production of documents. This discovery was propounded after Ms. Vergara's exceptions had been filed with the trial court. In particular, Ms. Vergara never made an appearance that subjected her to personal jurisdiction, and, in fact, had specifically excepted to personal jurisdiction and reserved all of her rights relating to jurisdiction. In support of her exceptions, she conducted limited discovery in order to establish whether Mr. Loeb was, in fact, a resident of and domiciled in Plaquemines Parish, the site of the 25th Judicial District Court. However, the discovery propounded upon Ms. Vergara by Appellants did not

---

[48] *Crook v. White,* 379 So. 2d 1166, 1168 (La. App. 2 Cir. 1980) (citing *Alexander v. Town of Jeanerette,* 371 So. 2d 124 (La. App. 3d Cir. 1979) ("[D]ismissal on an exception of non-joinder...should not be with prejudice.")).

inquire whether Ms. Vergara was subject to the trial court's jurisdiction. In summary, the discovery sought answers to questions surrounding the familial status of Ms. Vergara and Mr. Loeb as it related to the embryos, whether Ms. Vergara had expended or intended to expend any money on the preservation of the embryos and posed best interest questions in terms of child custody as it related to the embryos. Additionally, Appellants requested the identity of any lay and expert witnesses whom Ms. Vergara intended to call "to testify as a witness in the captioned proceeding," not necessarily the trial on the exceptions that had been filed.

On November 15, 2018, Ms. Vergara filed a motion to stay discovery on the basis that it was irrelevant as to jurisdiction—the limited purpose why Ms. Vergara had propounded discovery on Appellants. On March 18, 2019, the trial court held a hearing regarding Ms. Vergara's motion to stay. The trial court issued a judgment on April 9, 2019, which was noticed on April 10, 2019, wherein it granted Ms. Vergara's request for a stay of the discovery. However, the trial court limited the time and scope of the stay as follows: it was effective only through the date and time that the exceptions filed by Ms. Vergara would be disposed of, and Appellants were permitted to propound discovery related solely to the issues of jurisdiction, domicile and venue in order to respond to Ms. Vergara's exceptions.

On June 21, 2019, Appellants filed a motion to compel discovery wherein they requested that Ms. Vergara be compelled to respond to Appellants' second requests for admissions, interrogatories, and requests for production of documents.

On August 19, 2019, the trial court held a hearing on the motion to compel and took the matter under advisement. On September 10, 2019, the trial court issued a notice of judgment denying Appellants' motion to compel and ruled that Ms. Vergara would not need to respond to discovery pertaining to the UCCJEA.

On September 16, 2019, the day of the hearing on Ms. Vergara's exceptions, Appellants filed an emergency writ with this Court requesting a stay and consideration of the motion to compel. On the same day, a different panel of this Court denied the writ and the stay.[49] This Court, in *Channelside Servs., LLC v. Chrysochoos Grp., Inc.*, has stated that "the denial of … [a] writ application does not bar our reconsideration of, or a different conclusion on, the same issue when raised on appeal from a final judgment." 2015-0064, p. 6 (La. App. 4 Cir. 5/13/16), 194 So. 3d 751, 755 (internal citations omitted). Accordingly, we exercise our appellate jurisdiction to consider the merits of this particular assignment of error.

"A trial court has broad discretion in handling discovery matters and an appellate court should not upset a ruling absent an abuse of discretion." *Dabezies v. Trelo,* 2018-0278, p. 2 (La. App. 4 Cir. 5/23/18), 248 So. 3d 498, 501 (citing *Sercovich v. Sercovich,* [20]11-1780, p. 5 (La. App. 4 Cir. 6/13/12), 96 So. 3d 600, 603). "Under this abuse of discretion standard of review, '[a]n appellate court must balance the information sought in light of the factual issues involved and the hardship that would be caused by the court's order when determining whether the trial court erred on a discovery order.'" *Id.*, pp. 2-3 (citing *Favrot v. Favrot,*

---

[49] *Nick Loeb, et al. v. Sophia Vergara,* 2019-C-0789.

[20]12-1573, p. 4 (La. App. 4 Cir. 5/1/13), 115 So. 3d 1190, 1193). "A party seeking to compel discovery bears the burden of proving that the matters sought to be discovered are relevant." *Id.*, p. 4 (citing *State ex rel. Ieyoub v. Racetrac Petroleum, Inc.,* [20]01-0458, p. 18 (La. App. 3 Cir. 6/20/01), 790 So. 2d 673, 685).

Louisiana Code of Civil Procedure article 1422, which is the guiding statutory provision on discovery, states, in pertinent part: "[u]nless otherwise limited by order of the court in accordance with this Chapter… [p]arties may obtain discovery regarding any matter…which is relevant to the subject matter involved in the pending action… [as long as] the information sought appears reasonably calculated to lead to the discovery of admissible evidence."

During the pre-trial posture of a case, such as the case presently, to determine whether personal jurisdiction exists for a court to consider the merits of the matter, the Third Circuit Court of Appeal has stated the following with regard to discovery:

> Plaintiffs faced with an exception of lack of personal jurisdiction filed by the defendant may pursue limited and *reasonable* discovery measures which are calculated to lead to *relevant* evidence on the issue of jurisdiction. A survey of Louisiana jurisprudence on this issue indicates that courts routinely consider evidence such as depositions, affidavits, answers to interrogatories, and documentary evidence when deciding declinatory exceptions of lack of personal jurisdiction. For example, in the recent case of *Maguire Plastic Surgery Ctr., LLC v. Booker, supra,* the plaintiff's jurisdictional discovery included propounding interrogatories and requests for production, as well as the deposition of an employee of one of the defendants. See also *de Reyes v. Marine Mgmt. & Consulting, Ltd.,*

*supra* (discovery depositions were taken); *IberiaBank v. Thornton,* 45,332 (La.App.2d Cir.6/23/10), 44 So. 3d 720 (the evidence considered by the court included loan documents, correspondence between the parties and the deposition of one of the defendants); *SteriFx, Inc. v. Roden, supra* (deposition extracts and other documentary evidence were submitted to the trial court); *Cohen v. Cohen,* 635 So. 2d 1293 (La. App. 4 Cir. 4/14/94), (two affidavits were submitted in support of the exception); *Eng'g Dynamics, Inc. v. Massachusetts Inst. of Tech.,* 05–295 (La. App. 5 Cir.11/29/05), 917 So. 2d 1168 (affidavits were submitted in support and opposition to the exception of lack of personal jurisdiction); *Jacobsen v. Asbestos Corp. Ltd.,* 12–655 (La. App. 5 Cir. 5/30/13), 119 So. 3d 770 (the court considered an affidavit in support of the exception, as well as two depositions and various other documents in opposition). (emphasis in original).

*Johnson v. Byrd*, 48-411, pp 11-12 (La. App. 2 Cir. 9/25/13), 125 So. 3d 1220, 1227-28.

In applying the jurisprudential and codal authorities to the instant matter, we conclude that the trial court did not abuse its discretion in denying Appellants' motion to compel. When Appellants propounded their discovery, the only issues under consideration were jurisdictional in nature: whether the trial court had jurisdiction over Ms. Vergara and whether venue was proper in the 25th Judicial District Court for the Parish of Plaquemines. Ms. Vergara reserved her right and did not waive personal jurisdiction for purposes of resolving the jurisdictional issues. Although she conducted extensive discovery, it was limited in scope and nature and dealt exclusively with the sole issues of personal jurisdiction and venue.

Conversely, Appellants' propounded discovery that had little or nothing to do with the exceptions at hand and the issues of venue and jurisdiction, and were

not reasonably calculated to lead to the discovery of admissible evidence pertaining to jurisdiction. For instance, in addition to interrogatories and requests for production of documents, Appellants' issued the following requests for admissions to Ms. Vergara:

(1) Please admit you are the biological mother of Emma and Isabella.

(2) Please admit Nick Loeb is the biological father of Emma and Isabella.

(3) Please admit you have no current intention of bringing Emma and Isabella to birth, whether through a surrogate or otherwise.

(4) Please admit you have no current intention of taking any steps to afford Emma and Isabella the opportunity to be born.

(5) Please admit you desire to keep Emma and Isabella in cryopreservation indefinitely.

(6) Please admit keeping Emma and Isabella in cryopreservation indefinitely would inevitably and eventually result in Emma and Isabella's deaths.

(7) Please admit you consider Emma and Isabella property.

(8) Please admit you do not consider Emma and Isabella human beings.

(9) Please admit you have no intention of providing for Emma and Isabella's needs, financially, emotionally or otherwise, while they are in cryopreservation.

(10) Please admit you have no intention of providing for Emma and Isabella's needs, financially, emotionally, or otherwise, should they be born.

(11) Please admit you are not currently providing any type of financial support for Emma and Isabella while they are in cryopreservation.

(12) Please admit that you are not currently paying the costs of Emma and Isabella's cryopreservation and/or storage.

The interrogatories and requests for production of documents sought information that, for the most part, mirrored what was being asked in the requests for admissions; none of which pertained to the issues of jurisdiction or sought

answers that would reasonably be calculated to lead to the discovery of admissible evidence pertaining to the issues of jurisdiction. The discovery sought went to the merits of the underlying lawsuit, rather than merely the procedural issues that were at issue before the trial court. Moreover, once the trial court disposed of the exceptions and dismissed the underlying lawsuit, the trial court was justified in denying the motion to compel.

We find that the trial court did not abuse its broad discretion in denying the motion to compel and thus, we find Appellants' assignment of error number nine (9) to be without merit.

## CONCLUSION

As a result of the conclusions reached regarding Appellants' assignments of error herein-above, we pretermit discussion on the remaining three (3) assignments of error pertaining to the exception of no right of action, the exception of no cause of action, and the exception of lack of procedural capacity as moot.

## DECREE

Based on all of the aforementioned, we render judgment as follows:

- motion to seal—we reverse the judgment of the trial court and order that the entire record be unsealed, with the exception of those portions of the trial record that have been previously redacted;

- declinatory exception of *lis pendens*—we affirm the judgment of the trial court; however, to the extent that the trial court dismissed the

94

lawsuit, pursuant only to this exception, we reverse that portion of the judgment;

- declinatory exception of improper venue—we affirm the judgment of the trial court;

- declinatory exception of subject matter jurisdiction—we affirm the judgment of the trial court;

- declinatory exception of personal jurisdiction—we affirm the judgment of the trial court;

- peremptory exception of nonjoinder—we affirm the judgment of the trial court; however, to the extent that the trial court dismissed the lawsuit with prejudice, pursuant only to this exception, we amend that part of the judgment and render that it be dismissed without prejudice; and

- motion to compel—we affirm the judgment of the trial court.

**REVERSED IN PART, AMENDED IN PART, AFFIRMED IN PART, RENDERD IN PART**